PITTSTON STEVEDORING CORPORATION and the Home Insurance Company, Petitioners,

v.

Anthony DELLAVENTURA,

and

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, United States Department of Labor, Respondents.

NORTHEAST MARINE TERMINAL COMPANY, INC., Employer, and State Insurance Fund, Carrier, Petitioners,

v.

Ralph CAPUTO, Claimant, and Director, Office of Workers' Compensation Programs, U. S. D. L., Respondents.

PITTSTON STEVEDORING CORPORATION, Petitioner,

v.

John SCAFFIDI and Director, Office of Workers' Compensation Programs, U. S. D. L., Respondents.

INTERNATIONAL TERMINAL OPERATING COMPANY, INC., Self-Insured Employer-Petitioner,

v.

Carmelo BLUNDO, Claimant,

and

Director, Office of Workers' Compensation Programs, U. S. D. L., Respondents.

Nos. 1004, 1014, 1044, 1111, Dockets 76–4042, 76–4009, 76–4043 and 76–4249.

United States Court of Appeals, Second Circuit.

Argued May 20, 1976.

Decided July 1, 1976.

Certiorari Granted Dec. 6, 1976.

See 97 S.Ct. 522.

Joseph F. Manes, Croton-on-Hudson, N.Y., for Pittston Stevedoring Corp. and The Home Ins. Co.

William M. Kimball, New York City (Burlingham, Underwood & Lord, New York City, of counsel), for Northeast Marine Terminal Co. and State Ins. Fund.

Leonard J. Linden, New York City (Linden & Gallagher, New York City, of counsel), for International Terminal Operating Co., Inc.

Angelo C. Gucciardo, New York City (Israel, Adler, Ronca & Gucciardo, New York City, of counsel), for respondents Dellaventura, Caputo, Scaffidi and Blundo.

Ronald E. Meisburg, U.S. Dept. of Labor, Washington, D.C. (William J. Kilberg, Sol. of Labor, Laurie M. Streeter, Associate Sol., Jean S. Cooper, Esq., and Francine K. Weiss, Dept. of Labor, Washington, D.C. of counsel), for Director, Office of Workers' Compensation Programs.

Thomas W. Gleason, Jr., New York City (Irwin Herschlag, New York City, of counsel), for International Longshoremen's Association, AFL–CIO, amicus curiae.

Thomas D. Wilcox, Washington, D.C., for National Association of Stevedores, amicus curiae.

Before LUMBARD, FRIENDLY and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

We have here four petitions under 33 U.S.C. § 921(c) by employers, in some instances joined by their insurance carriers, to review orders of the Benefits Review Board (BRB) affirming compensation awards made to four employees under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), as amended in 1972, 33 U.S.C. §§ 901 et seq.[1] They present a

---

1. The Benefits Review Board was created by the 1972 Amendments to the LHWCA as an independent, "quasi-judicial" body within the Department of Labor. 33 U.S.C. § 921(b)(1); 20 C.F.R. § 801.103 (1975). Its three members are appointed by the Secretary of Labor, and it is "authorized to hear and determine appeals raising a substantial question of law or fact taken by any party in interest from decisions with respect to claims of employees under this chapter," made by the administrative law judges who hear LHWCA claims in the first instance. 33 U.S.C. §§ 919(d), 921(b)(1) and (3) (as amended). Prior to the 1972 amendments, there was no administrative review procedure for LHWCA claims; cases were heard in the first instance by Deputy Commissioners and review was then had in the United States dis-

question of considerable importance, namely, how far the 1972 Amendments extended the coverage of LHWCA.

Presented with the same general issue, a divided panel of the Fourth Circuit ruled in favor of the employers, *I.T.O. Corporation of Baltimore v. Benefits Review Board, U. S. Dep't of Labor and Adkins,* 529 F.2d 1080 (4 Cir. 1975), holding that the Act extended benefits only to persons injured while unloading cargo from the ship to what the majority termed a "first point of rest," i. e., the first place where the cargo is deposited on a pier or terminal area after being unloaded, and to persons injured while loading cargo from the "last point of rest," 529 F.2d at 1081. The *I.T.O.* case has been reheard *en banc.* We are told that only one other circuit has construed the extended coverage provisions here at issue, *Weyerhaeuser Co. v. Gilmore,* 528 F.2d 957 (9 Cir. 1975), rehearing denied, Feb. 6, 1976, petition for cert. filed, No. 75–1620, 44 U.S.L.W. 3645 (U.S. May 6, 1976), a case we do not consider to be truly relevant, but that the issue here presented is *sub judice* in the First Circuit, *John T. Clark & Son of Boston, Inc. v. William Stockman,* No. 75–1360, argued Jan. 5, 1976, and in the Fifth Circuit. Given the importance of the question, the number of courts of appeals endeavoring to find an answer, and the divergence of opinion already manifested, it seems unlikely that the opinion of any court of appeals will be the last word to be said. In consequence we shall not dwell on the long history of the problem of affording appropriate remedies for longshoremen and harbor workers against their employers which had its inception in *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) —a history which is interestingly traced in Gilmore & Black, The Law of Admiralty §§ 6–45 to –49 (2d ed. 1975)—but will proceed directly to the cases in hand.

trict courts. 33 U.S.C. § 921 (1970). Under the 1972 Amendments cases are heard by an administrative law judge whose decisions are re-

## I. *The 1972 Amendments*

The situation that led to adoption of the 1972 Amendments was described as follows in the portion of the Senate Report headed "Need for the Bill," S.Rep.No.92–1125, 92d Cong., 2d Sess. 4–5 (1972), U.S.Code Cong. & Admin.News 1972, p. 4698.

Since 1946, due to a number of decisions by the U.S. Supreme Court, it has been possible for an injured longshoreman to avail himself of the benefits of the Longshoremen's and Harbor Workers' Compensation Act and to sue the owner of the ship on which he was working for damages as a result of his injury. The Supreme Court has ruled that such ship owner, under the doctrine of seaworthiness, was liable for damages caused by any injury regardless of fault. In addition, shipping companies generally have succeeded in recovering the damages for which they are held liable to injured longshoremen from the stevedore on theories of express or implied warranty, thereby transferring their liability to the stevedore company, the actual employer of the longshoremen.

The social costs of these law suits, the delays, crowding of court calendars and the need to pay for lawyers' services have seldom resulted in a real increase in actual benefits for injured workers.

For a number of years representatives of the employees have attempted to have the benefit levels under the Act raised so that injured workers would be properly protected by the Act. At the same time, employer groups indicated their willingness to increase such payments but indicated they could do so only if the Longshoremen's and Harbor Workers' Compensation Act were to again become the exclusive remedy against the stevedore as had been intended since its passage in 1927 until modified by various Supreme Court decisions.

viewed by the BRB, and appeals lie to the court of appeals directly from final orders of the BRB. 33 U.S.C. § 921(c).

The bill reported by the committee meets these objections by specifically eliminating suits against vessels brought for injuries to longshoremen under the doctrine of seaworthiness and outlawing indemnification actions and "hold harmless" or indemnity agreements. It continues to allow suits against vessels or other third parties for negligence. At the same time it raises benefits to a level commensurate with present day salaries and with the needs of injured workers whose sole support will be payments under the Act.

In practical terms the bill was a trade-off. See *Landon v. Lief Hoegh and Co., Inc.,* 521 F.2d 756, 761–62 (2 Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976). Stevedores and other employers were pushing for complete abolition of the three-way damage action possible under *Seas Shipping Co., Inc. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), which held longshoremen and other harbor workers to be "seamen" entitled to sue the ship for unseaworthiness, and *Ryan Stevedoring Co., Inc. v. Pan-Atlantic S. S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), which permitted the shipowner to seek indemnity for any liability thus entailed from an injured worker's employer. This triangle in effect exposed the employer (already liable for and often having paid the limited benefits provided by the LHWCA) to an unlimited liability to the employee for damages and to the shipowner for its counsel fees in defending the employee's suit. The unions representing longshoremen and other harbor workers, which for years had been seeking increased benefits under the Act, opposed Congressional repeal of their *Sieracki*-created status as "seamen" in part on the grounds that the LHWCA's benefits were so low that workers needed the additional protection of the "unseaworthiness" doctrine. The compromise between these positions effected by the 1972 Amendments was this: The *Sieracki* action for unseaworthiness was eliminated, longshoremen in the future could sue the ship only for negligence, and employers were immunized from indemnity suits by shipowners. 33 U.S.C.

§ 905(b). In return, the workers were to secure increased benefits under LHWCA and, what is here pertinent, an extension of that statute's coverage. Thus the Senate Committee said that the principal purpose of the Amendments was "to upgrade the benefits, extend coverage to protect additional workers, provide a specified cause of action for damages against third parties, and to promulgate administrative reforms," Sen.Rep., *supra,* p. 1.

The change in the coverage section was dramatic. Before amendment the first sentence of 31 U.S.C. § 903(a) read:

Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law.

The Amendments altered this to read:

Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

In place of the definition of "employee" previously contained in § 902(3) as "not includ[ing] a master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net," the Amendments defined the term as follows:

The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any

person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

The definition of "employer," § 902(4),

> (4) The term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock).

was modified by inserting after "navigable waters of the United States" the expansion of that term by the parenthetical phrase in § 903.[2]

Thus, under the Amendments there are two tests for coverage under the Act: a "situs" test requiring the injury to occur on the "navigable waters" as now defined, and a "status" test which requires that the employee be "engaged in maritime employment," etc. While the situs test has been liberalized, the creation of an employee status test adds a new element to the coverage requirements.[3] The problem with which we are here concerned arises from Congress' failure to supply any definition of two terms in § 902(3)—"engaged in maritime employment" and "any longshoreman or other person engaged in longshoring operations."

## II. *The Facts*

Two of the cases before us, relating to claimants Blundo and Scaffidi, concern the loading or unloading of containers; the other two, relating to claimants Dellaventura and Caputo, involve loading of ordinary cargo into consignees' trucks on the pier.

(1) *Blundo.* Claimant Blundo was employed as a "checker" by the International Terminal Operating Co. (ITO).[4] He was injured while checking cargo being removed from a container at the 19th Street pier in Brooklyn when he walked around a draft containing cargo to mark it, slipped on some ice and fell. He was working on the stringpiece within 30 to 40 feet of the water. The container he was checking had been unloaded a few days before at a different pier and then taken by a truckman over city streets to the 19th Street pier where it was opened by the United States Customs Office and then stripped. The Administrative Law Judge (ALJ) found that the 19th Street pier was not utilized by the employer for the actual loading or unloading of vessels but rather for the storage of commodities and for the "stripping, or stuffing, *i. e.,* loading or unloading of containers." The BRB affirmed his findings as to the employee's status and the situs of the accident and upheld a compensation award under the LHWCA.

(2) *Scaffidi.* Claimant Scaffidi was employed by Pittston Stevedoring Corp. as a "hustler" operator, a kind of trucker who moves containers within a terminal. On March 12, 1973, Scaffidi drove a hustler loaded with containers of cargo from the Columbia Street Pier in Brooklyn, New York, through some ten blocks of public streets to Pier 12. On arriving at Pier 12 he backed the container to a receiving platform on the dock in preparation for loading the container on to the ship. When the container was opened, a large case fell out and injured him. The BRB affirmed the findings of the ALJ on the ground that the operator of a hustler used to transport containers within a terminal is engaged in an essential step in the overall process of loading cargo aboard a vessel, which was maritime employment as contemplated in 33 U.S.C. § 902(3). It found that the fact that the container had been transported over public streets was irrelevant.

(3) *Dellaventura.* Claimant Dellaventura, employed by Pittston Stevedoring Cor-

---

**2.** The significance of this definition is that liability for compensation is predicated on being an "employer," 33 U.S.C. § 904.

**3.** Formerly, if an employee was not expressly excluded, as, e. g., a crew member, his injury occurring upon the navigable waters was compensable under the Act so long as his employer had "any . . . employees . . . employed in maritime employment, in whole or in part . . . ." 33 U.S.C. § 902(4) (1970).

**4.** A "checker" checks the contents of a container carrying goods for several consignees against the bills of lading or other records.

poration as a "sorter," was injured on June 27, 1973 at Pier 20 of the Pouch Terminal on Staten Island while helping to load a truck, belonging to a consignee, with coffee bags which had been offloaded from the ship *"CAMPECHE"* on or about February 16, 1973. Dellaventura slipped on some loose coffee beans while inside the truck. At times Dellaventura's responsibilities included going into the holds of ships to assist in sorting and loading or off-loading cargo. The accident occurred about 30 feet from the water's edge on the pier. The record affords no explanation for the consignee's 133-day delay in picking up the bags of coffee beans, but the ALJ found that the pier contained no warehouse facilities. The BRB affirmed his decision on the grounds set forth in *Avvento v. Hellenic Lines,* BRB No. 74–153, 1 BRBS 174, 1975 A.M.C. 153 (Nov. 12, 1974), which held that " 'until cargo is delivered to a trucker or other carrier who is to pick it up for further trans-shipment, such cargo is in maritime commerce and all employees engaged in its movement to that point are engaged in maritime employment.' "

(4) *Caputo.* Claimant Caputo was usually employed as "terminal labor" by Pittston Stevedoring Corp. When there was no work available at Pittston, he would take a "shape up" job as a longshoreman wherever it was available and on the day of the accident was working for Northeast Marine Terminal Co., Inc. at their terminal adjoining the water in Brooklyn. He was injured while helping a cargo consignee's truckdriver load boxes of cheese, discharged from a vessel at least five days previously, inside the consignee's truck; the injury occurred while he was rolling a dolly loaded with the cheese on it into the truck. Caputo and the employer stipulated that the work he was doing when injured involved the same risk as would obtain wherever and by whomsoever trucks were loaded or unloaded with dollies. But the ALJ found the stipulation lacked significance "in view of the situs where the injury actually occurred." The ALJ made an award in his favor and the BRB concurred.

## III. *Motion to Dismiss Petitions in Dellaventura's Case as Untimely*

■ Dellaventura and the Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor (OWCP), by his attorney, the Solicitor of Labor, have moved to dismiss the petitions of the employer, Pittston Stevedoring Corp., and its insurance carrier, The Home Insurance Co., as untimely. We grant Dellaventura's motion, thereby rendering it unnecessary to decide whether the Solicitor of Labor was entitled to make one.[5]

5. The issue whether the BRB should be a respondent in court of appeals review of its awards under 33 U.S.C. § 921(c) was treated in *McCord v. Benefits Review Board,* 168 U.S. App.D.C. 302, 514 F.2d 198 (1975). There the BRB moved to dismiss the petition as to it. Petitioner did not oppose the motion and the court granted it, citing recent unreported decisions of the Ninth Circuit. The court reasoned that there was "sufficient adversity" between the claimant and the employer (or its insurance carrier) "to insure proper litigation without participation by the Board," that requiring the Board to participate "would parallel requiring the District Court to appear and defend its decision upon direct appeal" and that the presence of the second comma in 33 U.S.C. § 921(c) which reads:

A copy of such petition shall be forthwith transmitted by the clerk of the court, to the Board, and to the other parties, and thereupon the Board shall file in the court the record

in the proceedings as provided in section 2112 of Title 28.

indicated an intention that the Board should not be a party to the appeal. There were pending motions to substitute the Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor (OWCP), as a respondent which were *not before the court of appeals.* In the *I.T.O.* case, *supra,* the Board moved to be dismissed as a respondent and to have the Director substituted; the court granted the first branch of the motion but denied the second, 529 F.2d at 1088–89.

With respect, we cannot subscribe to the view that Congress intended to create what to us would seem a novel form of review of federal administrative action in which no one representing the Government would be a party. See F.R.App.P. 15(a) ("In each case the agency shall be named respondent."). Prior to the 1972 Amendments judicial review took the form of a suit for an injunction in the district court against the deputy commissioner who made the order (former § 921(b)); in the ab-

The statute, 33 U.S.C. § 921(c), provides that a person adversely affected or aggrieved by a final order of the BRB may obtain review by the court of appeals for the circuit where the injury occurred "by filing in such court within sixty days following the issuance of such Board order a written petition praying that the order be modified or set aside." The BRB's order was issued on October 9, 1975, but the petition for review was not filed until February 5, 1976.

Petitioners' basis for resisting the motion is as follows: The BRB's Rules and Regulations, 20 C.F.R. § 802.403(b), provide that the original of any BRB decision shall be filed with the Clerk of the Board, which was done here, and that "[a] copy of the Board's decision shall be sent by certified mail or served personally on all parties to the appeal and the Director." The rule does not say when this should be done. Apparently no such notice was sent to the employer or the insurance carrier but the attorney who represented both parties before the BRB and in this court acknowledges that he received a copy within the 60-day period and does not deny that he advised his clients.

Like 28 U.S.C. § 2344 and similar provisions in the statutes for the review of orders of other agencies, 33 U.S.C. § 921(c) makes the time for seeking review start to run from the entry of the agency's order, even though the agency is under a duty to give notice. See *Willow Crossing Dairy Farm v. Hardin*, 327 F.Supp. 798 (W.D.Pa. 1970) (where review section of Agricultural Adjustment Act provided for filing of review petition within 20 days of "entry" of judgment, word "entry" is to be interpreted

sence of evidence of Congressional intent we find it hard to believe that, by providing internal review followed by an appeal to a court of appeals, Congress meant to oust the Government from further participation as of right. Appearance as an *amicus* may not be good enough, since it normally does not allow oral argument and never allows an appeal.

Neither the *McCord* nor the *I.T.O.* court discussed § 921a which provides:

Attorneys appointed by the Secretary shall represent the Secretary, the deputy commissioner, or the Board in any court proceedings under section 921 of this title or other provisions of this chapter except for proceedings in the Supreme Court of the United States.

The existence of sufficient adversity between private parties has not been thought to preclude the Government's right to be a party in many other sorts of review of federal administrative action. The second comma, especially in a sentence with an inappropriate first one, seems a slender reed; the "other parties" phrase means the other parties to the BRB review but does not rule out the BRB's being a party to review in the court of appeals. While Congress did not spell matters out with the same specificity as in 28 U.S.C. § 2348, we think it sufficiently indicated its intention that the BRB and other parties to the proceeding before the BRB should be parties to a review by a court of appeals under 33 U.S.C. § 921(c); if the BRB chooses to leave the defense of its order in a particular case to the prevailing private party, it is free to do so.

The administrative regulations do not specify which branch of the agency should be represented as respondent on appeal. 20 C.F.R. § 801.402 seems to contemplate that the BRB is the proper agency respondent in court of appeals review, since it provides that "except in proceedings in the Supreme Court" the representation of the BRB is provided by the Solicitor of Labor. Moreover, § 921a quoted above seems to contemplate that the BRB be represented in court of appeals review. However, 20 C.F.R. § 801.2(a)(10) defines "party" and "party in interest" to include the "Secretary or his designee . . . ." This would indicate that the Secretary of Labor shall determine what officer represents the agency in the court of appeals. The Government's position has been that the Director, OWCP is the proper respondent. The OWCP is an administrative, not a statutory, creation. See 20 C.F.R. §§ 1.1 et seq., and § 701.203. And the Solicitor of Labor is authorized to appear and participate on behalf of the Director, OWCP as an interested party before the BRB. 20 C.F.R. § 702.-333(b). However, in the section assigning to the OWCP the responsibility for administering various programs, including the LHWCA, the OWCP is given administrative authority "except [for] 921 as it applies to the Benefits Review Board . . . ." 20 C.F.R. § 1.2(d).

Trying to make sense out of these regulations, we think that while the Director, OWCP is a proper party before the ALJ or the BRB, see cases discussed in 3 *Larson, Workmen's Compensation Laws* § 83.19, at n. 49.1 (1976 ed.), the BRB is the proper agency respondent for review in the court of appeals, although the Solicitor of Labor could be designated to represent it. We deem it best to defer resolution of this question to a case where decision on this point is essential; perhaps in the meanwhile the Department will tidy up its regulations.

normally and petition filed September 28 to review order of September 2 was not timely and did not vest the court with jurisdiction even though counsel for plaintiff did not receive notice of ruling until September 8). The BRB's regulations count the 60-day period from the date on which the decision is "filed," 20 C.F.R. § 802.410.[6] In the parallel situation of review of judgments of district courts in civil cases Rule 4(a) of the Federal Rules of Appellate Procedure likewise makes the entry of judgment the critical date; F.R.Civ.P. 77(d) directs the clerk to serve notice of the entry of a judgment or order but expressly provides that "[l]ack of notice of the entry by the clerk does not affect the time to appeal or relieve or authorize the court to relieve a party for failure to appeal within the time allowed, except as permitted in Rule 4(a) of the Federal Rules of Appellate Procedure," namely, "upon a showing of excusable neglect."

We see no reason not to read 33 U.S.C. § 921(c) as meaning what it says. Cf. *United States v. Michel,* 282 U.S. 656, 51 S.Ct. 284, 75 L.Ed. 598 (1931); *American Construction Co. v. United States,* 107 F.Supp. 858, 123 Ct.Cl. 408 (1952), *cert. denied,* 345 U.S. 922, 73 S.Ct. 780, 97 L.Ed. 1354 (1953). The policy requiring that appeals be timely taken is so strong that ministerial failures by a clerk cannot be allowed to overcome it. The Act, like many other administrative review statutes, does not seem even to encompass the "excusable neglect" escape hatch provided for untimely appeals from the district courts. But even if it should be construed as doing so, this would be a most inappropriate case for granting relief. The clerk made the pardonable error of notifying the attorney rather than the parties, exactly what a clerk of a district court is directed to do, F.R.Civ.P. 5(b) and 77(d),

and the attorney offers no explanation for having failed to file the petition within the allotted time.

## IV. *Motion to Dismiss Petition in Scaffidi's Case as Not Presenting a Justiciable Controversy*

In the proceedings up through the decision of the ALJ, the caption of this case named both Pittston and Gulf Insurance Company, its insurance carrier, as respondents; both were represented by the same attorney. After the ALJ's decision the insurance carrier paid the award and chose not to contest it further. Pittston then engaged its present attorney who altered the caption. Apparently the claimant made no point before the BRB that the carrier's payment of the award mooted the case; he does now. Despite the general rule that objections not raised before an administrative body cannot be raised on review, we must consider this one since it goes to our jurisdiction.

We see no basis on which a reversal of the BRB's decision would enable the insurance carrier to recover from Scaffidi a payment the liability for which it chose not to contest, and Pittston, which was invited to file a reply brief on the issue, does not suggest one. Cf. *Federal Insurance Co. v. Detroit Fire & Marine Insurance Co.,* 202 F. 648 (6 Cir.), *cert. denied,* 229 U.S. 620, 33 S.Ct. 778, 57 L.Ed. 1354 (1913) (insurer which paid its share of loss and failed to join other subrogated insurers in third party suit held entitled to recover ratable share of damages won). Pittston claims instead that it is nonetheless a "person adversely affected or aggrieved" by the BRB's order, 33 U.S.C. § 921(c), since the award will adversely affect its experience rating and thus increase its future premiums. Cf.

6. In the only case construing the statutory provisions for mail notice to the parties of the Deputy Commissioner's decision under the old act, 33 U.S.C. § 919, the Deputy Commissioner's first order was apparently neither filed in his office nor mailed to the parties. The court held, in response to the employer's argument that a second, more generous award was barred by the first award, that the first order

"did not take on the dignity of an effective award." *American Mutual Liability Ins. Co. of Boston v. Lowe,* 13 F.Supp. 906, 907 (D.N.J.), *aff'd,* 85 F.2d 625 (3 Cir. 1936). We believe this case to be wholly distinguishable particularly since both opinions rest primarily on the failure to file a *signed* order. 13 F.Supp. at 907 (citing *Howard v. Monahan,* 33 F.2d 220 (S.D.Tex. 1929)).

*Travelers Insurance Co. v. Belair,* 284 F.Supp. 168 (D.Mass.1968).

Pittston's contention that this interest affords it standing immediately encounters *Gange Lumber Co. v. Rowley,* 326 U.S. 295, 66 S.Ct. 125, 90 L.Ed. 85 (1945). The Court there held that the appellant-employer had failed to make a showing of substantial injury to any legally protected interest which would entitle it to question the validity under the due process clause of a state statute retroactively extending the time period in which workmen's compensation awards could be modified. Under the state's system, all awards were paid out of a state insurance fund supported by employer contributions of "premiums." Rejecting the employer's argument that its future premium rates would be adversely affected by the increased award, the Court held that the effect of any one accident was too minimal and its possible injury to the employer too speculative to establish the justiciability of the case.[7]

The *Gange* decision, however, has been severely criticized by Professor Davis. He notes that under the state statute the employer was permitted to appeal, and characterizes the result as "unique," "the extreme one of denying the employer's standing even though the statute conferred such standing." 3 *Davis, Administrative Law Treatise* § 22.13, n.4 (1958). It may well be that under the more liberal concepts of standing developed in such cases as *Ass'n of*

*Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), *Gange Lumber Co.* would not be followed. However, even on the standing issue alone, an overruling of *Gange Lumber Co.* would hardly carry the day for Pittston on this record where it has submitted nothing but conclusory assertions of adverse effect on future premiums.[8]

However all this may be, the liberalization of notions as to what makes a person "adversely affected or aggrieved" does not eliminate the requirement that in order for a controversy to be justiciable, the court must be able to afford effective relief. See *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 504–05, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971); *Local No. 8–6, Oil, Chemical & Atomic Workers Internat'l Union, AFL–CIO v. Missouri,* 361 U.S. 363, 367, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960); *St. Pierre v. United States,* 319 U.S. 41, 42, 63 S.Ct. 910, 87 L.Ed. 1199 (1943); *McKee v. Turner,* 491 F.2d 1106 (9 Cir. 1974). As indicated, Pittston has not claimed that Scaffidi will not retain his award even if we should reverse the BRB; what it is asking is simply an advisory opinion that the award should not have been made.[9] We do not doubt that

---

7. *Gange Lumber Co.* was followed in *Railway Express Agency v. Kennedy,* 189 F.2d 801 (7 Cir.), *cert. denied,* 342 U.S. 830, 72 S.Ct. 54, 96 L.Ed. 628 (1951) (denying employer standing to challenge unemployment compensation payments to striking workers from federal fund). Cf. 2A *Larson, Workmen's Compensation Law* § 77.30 (1976 ed.) (damage action by employer against negligent third party for increased premiums would lie).

8. There is no proof that payment of this one award would affect the premiums of such a large employer as Pittston. Moreover, we are not told whether the arrangements between Pittston and its insurance carrier allow the latter to take advantage of an award made without Pittston's consent in determining Pittston's ratings and, if so, whether a reversal by us would change matters.

9. *Jaabeck v. Theodore A. Crane's Sons Co.,* 238 N.Y. 314, 318, 144 N.E. 625 (1924), cited by the petitioner in its reply brief, is wholly inapposite. A state workmen's compensation board had entered an award against both the employer and its insurer, one of the questions determined by the board being that of the insurer's liability under the insurance contract. The Appellate Division affirmed the award as to the employer but reversed as to the insurer on the ground that the policy did not cover the risk. The employer appealed to the Court of Appeals, which reversed the Appellate Division with respect to the insurer, affirming in full the order of the State Industrial Board. The employer was clearly aggrieved by the order of the Appellate Division and the Court of Appeals gave effective relief by reinstating the order of the State Industrial Board.

where insurance only partially covers the liability, the employer may appeal from a judgment even though the insurer has paid its part. See *Moore v. Columibia Casualty Co.,* 174 F.Supp. 566 (S.D.Ill.1959); *Queen Ins. Co. of America v. Meyer Milling Co.,* 43 F.2d 885 (8 Cir. 1930). But where the issue of liability is determined against an insured and its insurer, and the insurer pays the damages in full even without the consent of the insured and chooses not to appeal, the insured cannot appeal from the judgment against him. *Ross v. Stricker,* 153 Ohio St. 153, 91 N.E.2d 18 (1950), discussed in 19 *Couch on Insurance 2d* § 78.228. In short, as the Supreme Court has said, albeit in a different context, once an insurer "has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name." *United States v. Aetna Casualty & Surety Co.,* 338 U.S. 366, 380–81, 70 S.Ct. 207, 215, 94 L.Ed. 171 (1949); *Link Aviation, Inc. v. Downs,* 117 U.S.App. D.C. 40, 325 F.2d 613 (1963). See also *Zauderer v. Continental Casualty Co.,* 140 F.2d 211 (2 Cir. 1944). This seems a reasonable application of the general rule that a party who has no interest in a fund cannot appeal from an order disbursing the fund. *Seaboard Surety Co. v. United States,* 306 F.2d 855 (9 Cir. 1962), and cases cited at 306 F.2d at 859, n.6. We therefore dismiss Pittston's petition.[10]

---

**10.** An additional reason for this conclusion is that once the insurance carrier has paid, without preserving its right to recover the payment by taking an appeal, the case lacks the necessary quality of adversariness. We see no reason why a person in Scaffidi's position should bother to defend against a petition to review or why the BRB or the Director should spend the Government's resources in such a case, even though that was done here.

**11.** *Nacirema Operating Co., Inc., supra,* reversed the *en banc* decision of the Fourth Circuit in *Marine Stevedoring Corp., supra.* Four cases were before the court of appeals in the consolidated appeal; in only three cases were petitions for *certiorari* filed and granted. Those three cases involved employees injured on the pier as described above whom the Deputy Commissioner had ruled were *not* covered

## V. *Interpretation of the Statute*

With these preliminaries out of the way, we can now undertake our main task—the interpretation of the coverage clauses of the 1972 Amendments.

Admitting as they must that the Amendments worked some extension of coverage, petitioners and the National Association of Stevedores (NAS), as *amicus curiae,* would limit this to factual situations generally comparable to those in *Nacirema Operating Co., Inc. v. Johnson,* 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969). There the Court held that the Act, as it then stood, did not cover longshoremen killed or injured on a pier while attaching cargo from railroad cars to ships' cranes for removal to the ships, although coverage presumably would have existed had they been hurled into the water, *Marine Stevedoring Corp. v. Oosting,* 238 F.Supp. 78 (E.D.Va.1965), aff'd, 398 F.2d 900 (4 Cir. 1968) (en banc),[11] or injured on deck while performing part of the same operation, *Calbeck v. Travelers Ins. Co.,* 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962). Resting its decision solely on statutory grounds, the Court said that "[t]he invitation to move" the line dividing the coverage of LHWCA "landward must be addressed to Congress, not to this Court," 396 U.S. at 224, 90 S.Ct. at 354. Petitioners argue that the BRB's rationale in effect reads the "status" requirement out of the Act by afford-

by the LHWCA. The district courts had affirmed the Deputy Commissioners' denial of awards, and were reversed by the Fourth Circuit. In the fourth case (the title case in the court of appeals), the employee, also on the pier, had been injured while lifting a cable off the stern bollard of a vessel when it suddenly straightened, catapulting him into a river where he drowned. The Deputy Commissioner had found that the employee was covered under the Act, his award was affirmed by the district court and by the court of appeals, and it was not before the Supreme Court in *Nacirema.* Mr. Justice Douglas noted in his dissent that "[i]t is incongruous . . . that in an accident on a pier over navigable waters coverage of the Act depends on where the body falls after the accident has happened." 396 U.S. at 225, 90 S.Ct. at 355.

ing coverage to any longshoreman injured on a pier no matter what he is actually doing when injured.

The respondent employees, the International Longshoremen's Association (ILA), as *amicus curiae*, and the Solicitor of Labor (see note 5, *supra*) contend that the extension was much more substantial. Their position is that the process of unloading a vessel continues until the cargo is deposited on the consignee's truck on the pier (or begins, in the case of loading, when the goods are being removed from the delivery truck), and that anyone physically participating in this process is engaged in "maritime employment." We disagree with petitioners, without having to decide whether we would go to the full extent urged by their adversaries.

### A.

We begin our analysis by remarking on the unsatisfactory state of the records before us, even if we include for this purpose the two petitions which we have dismissed. When cases of this nature began coming to the BRB shortly after the enactment of the Amendments, it should have realized that it was faced with a major task of statutory construction—in determining what constitutes "maritime employment" or being a "longshoreman or other person engaged in longshoring operations"—which task could be performed satisfactorily only in the light of an extensive factual background detailing the structure of work on the various piers of this country. The following are illustrative of facts we would like to know but on which these records shed little or no light, even as regards the port of New York, let alone the rest of the nation. Does one gang normally take cargo off or on the ship while another is responsible for transportation beyond the "point of rest"? Does the same gang always, sometimes, or often perform both jobs? Is all work on the pier normally conducted by a single employer or is there a division between the stevedore and the "terminal operator"? Even if there is only one employer, does he segregate the employees in their work assignments, by having different collective bargaining agreements or otherwise? Are separate charges made for services beyond the "point of rest" and, if so, for what? Does the "point of rest" shift about on the same pier? Just what is the normal practice for stripping and stuffing containers with goods belonging to different owners or destined to different consignees? Is this work normally done on the pier or in warehouses not adjoining navigable waters? What determines the choices? Does the hazardous nature of the employment stop at the point of rest or continue so long as the cargo is on the pier? Do the hazards change in frequency or degree as the longshoreman moves away from the water? The consolidation of several cases presenting different factual situations in a single large proceeding might have enabled the BRB to make meaningful distinctions. Instead of developing such a record and laying down guidelines for the ALJ's, the BRB has handled each case on an individual basis,[12] and without establishing any record support for the interpretive rules announced therein.

If we were sitting as a court of last resort, we would remand these cases to the BRB on our own motion with directions to cause such a hearing to be held. But with the cases in their present posture in this circuit and others, we think it more helpful for us to state our views on what is now before us.[13]

12. We were told at argument that in the *I.T.O.* case the NAS tendered to the BRB a "Brandeis brief" intended to give the BRB some of the general information we have mentioned, outlining the division of labor in 45 ports in the United States; that the tender was rejected on the objection of the Solicitor on behalf of the Director, OWCP; but that the document was discussed at oral argument in the Fourth Circuit and has been referred to in other decisions of the BRB. We have not had even that much assistance.

13. If one or more of the other circuits seized of this problem should order such a remand, we would entertain a petition for rehearing to enable us to do the same.

## B.

Perhaps the most useful way to approach the issue is to begin by discussing certain arguments we have not found to be particularly helpful.

■ (1) *The "presumption" of coverage, 33 U.S.C. § 920.* The claimants, the Solicitor of Labor, and the ILA place great reliance on a provision in the LHWCA as originally adopted in 1927, 33 U.S.C. § 920, and still in effect, that four things shall be presumed in the absence of substantial evidence to the contrary. One of these is "[t]hat the claim comes within the provisions of this chapter." 33 U.S.C. § 920(a). They contend that if the meaning of the new coverage provision, 33 U.S.C. § 903, is in any way doubtful, this presumption requires the doubt to be resolved in favor of coverage. We do not think this was what Congress had in mind; the very fact that the presumption can be overcome by substantial contrary evidence indicates its inapplicability to an interpretive question of general import such as this. See *Crowell v. Benson*, 285 U.S. 22, 64–65, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

Even in cases holding that the accordion-like phrase "arising out of and in the course of employment," 33 U.S.C. § 902(2), could be widely stretched, the Court has done little more than mention the presumption, *Cardillo v. Liberty Mutual Ins. Co.*, 330 U.S. 469, 474, 67 S.Ct. 801, 91 L.Ed. 1028 (1947); *O'Keeffe v. Smith, Hinchman & Grylis Associates, Inc.*, 380 U.S. 359, 361, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965) (per curiam), resting its decision mainly on the principle with respect to the scope of review discussed below. In *O'Leary v. Brown-Pacific-Maxon, Inc.*, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483 (1951), the Court did not rely on the presumption at all, even in the face of a strong dissent. The Court's decisions dealing with questions of coverage of the sort presented here will be searched in vain for any mention of the presumption, see, e. g., *Parker v. Motor Boat Sales, Inc.*, 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184 (1941); *Norton v. Warner Co.*, 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931 (1944); *Calbeck v. Travelers Ins. Co., supra*, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962); *Nacirema Operating Co., Inc. v. Johnson, supra*, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969),[14] although in *Norton* and *Nacirema* coverage was rejected. The cases in this court, *Michigan Mutual Liability Co. v. Arrien*, 344 F.2d 640, 645–46 (2 Cir.), cert. denied, 382 U.S. 835, 86 S.Ct. 80, 15 L.Ed.2d 78 (1965), and *Overseas African Construction Corp. v. McMullen*, 500 F.2d 1291, 1296 (2 Cir. 1974), likewise treat the presumption as merely an embodiment of the "rule . . . that so long as any reasonable inference from the facts supports jurisdiction under the statutory presumption that jurisdiction may be found." 500 F.2d at 1296. Here the question is not whether a line established by Congress is sufficiently elastic to include the claimant; the main issue is whether Congress placed the line at the "point of rest" or much further landward. Only if we have made the latter basic decision might the presumption come into play in ruling on cases near the border. See *Davis v. Department of Labor*, 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942).

■ (2) *"Deference" to the BRB.* We likewise see no merit in the contention of claimants and the Solicitor of Labor that we are confined in our decision because of the deference owed to the BRB. We agree that the standard of review we must apply is that factual findings of the BRB are conclusive if supported by substantial evidence in the record considered as a whole since, as held in *Potenza v. United Terminals, Inc.*, 524 F.2d 1136 (2 Cir. 1975), it is of no moment that 33 U.S.C. § 921(b)(3) while applying this standard to the BRB's review

---

14. In *Davis v. Department of Labor*, 317 U.S. 249, 256, 63 S.Ct. 225, 87 L.Ed. 246 (1942), the Court noted that with respect to the largely "factual questions" relating to whether an employee injured within the "twilight zone" of federal jurisdiction established by the Court should be compensated under state or federal law, "presumptive weight" should be given to the findings of the federal or state administrator of the respective program, and relied in part on § 920(a).

of the ALJ's findings of fact does not expressly extend it to review in the court of appeals. But we are still confronted with the ever troubling question whether the determination at issue, namely, whether the 1972 Amendments should be so interpreted as to include these claimants, is the kind of question which justifies or requires judicial deference.

We think it is time to recognize, in line with Professor Kenneth Culp Davis' brilliant discussion, 4 Administrative Law Treatise §§ 30.01–.09 and the corresponding sections in the 1970 Supplement, that there are two lines of Supreme Court decisions on this subject which are analytically in conflict, with the result that a court of appeals must choose the one it deems more appropriate for the case at hand.[15] Leading cases supporting the view that great deference must be given to the decisions of an administrative agency applying a statute to the facts and that such decisions can be reversed only if without rational basis are *Rochester Telephone Corp. v. United States,* 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147 (1939); *Gray v. Powell,* 314 U.S. 402, 411–12, 62 S.Ct. 326, 86 L.Ed. 301 (1941); and *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 130–31, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). The rationale of these decisions was applied in the three "arising out of and in the course of employment" Supreme Court cases under the LHWCA—*Cardillo, O'Leary* and *O'Keeffe,* cited above. Indeed, the Court seems to have rejected the findings of the LHWCA's Deputy Commissioners only once since the statute was enacted, *Norton v. Warner Co., supra,* 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931. However, there is an impressive body of law sanctioning

free substitution of judicial for administrative judgment when the question involves the meaning of a statutory term. Illustrative cases are *Office Employees International Union, Local No. 11, AFL–CIO v. NLRB,* 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957), and *Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 150, 64 S.Ct. 474, 88 L.Ed. 635 (1944). In one of its most recent decisions on the subject, *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974), the Court held that "In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose"; this very nearly eliminates the "deference" principle as regards statutory construction altogether since if the agency's determination is found by a court to be consistent with the congressional purpose, it presumably would be affirmed on that ground without any need for deference.

There are several other reasons not to rest decision on the "deference" approach in these cases. One is that unlike the F.C.C. in the *Rochester Telephone* case, the Bituminous Coal Division of the Department of the Interior in *Gray v. Powell,* or the NLRB in the *Hearst* case, the BRB is not a policy making but entirely an umpiring agency. When Congress has charged an agency with the duty to make and implement a national policy, it is more likely that Congress intended the agency to have some flexibility, free from judicial intrusion, in interpreting the Congressional grant. Compare *Rochester Telephone Corp. v. United States, supra,* 307 U.S. at 146, 59 S.Ct. 754; *Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). A second factor is the way in

---

**15.** Our discussion of the Court's ambivalence with respect to deference is not to be read as dealing with two problems quite different from that here presented. One concerns an agency's exercise of power to formulate substantive rules, where the scope is wide, see, e. g., *American Telephone & Telegraph Co. v. United States,* 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936); *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944), and the rules once issued, even if only in the form of guidelines, are "entitled to great

deference," *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 430–36, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The other concerns an agency's construction of its own rules, see, e. g., *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 n.10, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976).

which the agency has gone about its job. As suggested above, we would be much more inclined to defer to a considered judgment of the BRB rendered on a full record than to this series of short opinions on isolated facts which contain no in-depth study of the problem. A somewhat related point is that although the BRB's decisions have been "consistent and contemporaneous," the issue arose almost immediately after the 1972 Amendments became effective at a time when the BRB had little experience in the administration of the Act; yet its initial decisions, surely not the result of any great expertise, became the basis for all the others. "[A]n agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate." *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620 (1973). Finally, this is a case where understanding of the statute depends in no small measure on prior judicial decisions and legislative history—subjects on which a court has a greater competence than the BRB. We therefore reject the argument that the BRB's decisions in these cases must be affirmed if they are rational but wrong.

■ (3) *Other definitions.* We likewise give little weight to arguments made on both sides which are based on definitions of "longshoreman" or maritime employment or contracts formulated in different contexts and for different purposes. The ILA relies on Congress' approval, Act of Aug. 12, 1953, ch. 407, 67 Stat. 541, of definitions (reproduced in the margin) [16] in a compact between New York and New Jersey creating the bi-state Waterfront Commission. To assume that the 1972 Congress had in mind this action of its predecessor of 1953 is to attribute a degree of acumen few Congressmen would claim. Beyond that, the purposes of the two enactments were quite different; it is for that reason that paragraph (b) of the definitional section of the Act includes persons, notably clerical workers, clearly not embraced under the most liberal construction of the 1972 Amendments.

On the other hand, a narrow definition of "longshoring operations" [17] formulated by the Secretary of Labor in 1960 as part of safety regulations issued in respect of "all employments covered by this chapter," 33 U.S.C. § 941(a), is likewise not dispositive of the meaning of the words used in the Amendments since under the old statute covered employment was limited to injuries occurring "upon the navigable waters of the United States (including [only] any drydock)." And despite the definition of "carriage of goods" as covering "the period from the time when the goods are loaded on to the time when they are discharged from the ship" contained in the Carriage of

---

16. See ILA Amicus brief at 5–6 n. 1. The definitions in the Bi-State Compact can be found at § 9806 of McKinney's Unconsolidated New York Laws and § 32:23–6 of N.J.S.A.

"Pier" shall include any wharf, pier, dock or quay.
"Other waterfront terminal" shall include any warehouse, depot or other terminal (other than a pier) which is located within one thousand yards of any pier in the Port of New York district and which is used for waterborne freight in whole or substantial part. . . .
"Longshoreman" shall mean a natural person, other than a hiring agent, who is employed for work at a pier or other waterfront terminal, either by a carrier of freight by water or by a stevedore
(a) physically to move waterborne freight on vessels berthed at piers, on piers or at other waterfront terminals, or

(b) to engage in direct and immediate checking of any such freight or of the custodial accounting therefor or in the recording or tabulation of the hours worked at piers or other waterfront terminals by natural persons employed by carriers of freight by water or stevedores . . . . .
"Stevedore" shall mean a contractor (not including an employee) engaged for compensation pursuant to a contract or arrangement with a carrier of freight by water, in moving waterborne freight carried or consigned for carriage by such carrier on vessels of such carrier berthed at piers, on piers at which such vessels are berthed or at other waterfront terminals.

17. * * * the loading, unloading, moving or handling of cargo, ships stores, gear, etc., into, in, on, or out of any vessel on the navigable waters of the United States.
25 Fed.Reg. 1566 (1960), 29 C.F.R. 9.3(i).

Goods by Sea Act (COGSA), 46 U.S.C. § 1301(e), we have held that the contract of carriage, obviously a maritime contract, persists after unloading and that the carrier remains liable, not as a carrier but as a bailee, until it delivers the cargo to the consignee or places it in a public dock or warehouse. *David Crystal, Inc. v. Cunard Steamship Co.*, 339 F.2d 295, 298 (2 Cir. 1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965); *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 811–12 (2 Cir. 1971); *Cameco, Inc. v. S.S. American Legion Lines*, 514 F.2d 1291, 1295–96 (2 Cir. 1974).

■ (4) *Liberal construction of remedial legislation.* There is more force in the contention of the claimants and the Solicitor that a broad reading of the 1972 Amendments is required by the oft-iterated principle that remedial legislation should be construed liberally. The Supreme Court said, as to this very statute, although in a quite different context, *Voris v. Eikel*, 346 U.S. 328, 333, 74 S.Ct. 88, 92, 98 L.Ed. 5 (1953):

This Act must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results.

Petitioners do not altogether overcome this point by arguing that a statute must be construed with reference to the mischief intended to be overcome, see *Heydon's Case*, 3 Co.Rep. 7a, 76 Eng.Rep. 637 (1584), and that all that Congress intended to "remedy" was the unjust result of *Nacirema Operating Co. v. Johnson, supra*, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371, by accepting the invitation which, pursuant to Mr. Justice White's suggestion, the unions extended to it.[18] The statutory language can fairly be read to do more than that and thus the liberality principle tends in favor of such a reading.

### C.

■ With this background we address ourselves, at long last, to the words of the statute with the aid of the legislative history. There is no question that claimants met the situs test of § 903(a),[19] and concededly

18. The argument, in fact, flounders on a number of points. The invitation issued in *Nacirema* was broadly phased:

There is much to be said for uniform treatment of longshoremen injured while loading or unloading a ship. But even construing the Extension Act to amend the Longshoremen's Act would not effect this result, since longshoremen injured on a pier by pier-based equipment would still remain outside the Act. And construing the Longshoremen's Act to coincide with the limits of admiralty·jurisdiction—whatever they may be and however they may change—simply replaces one line with another whose uncertain contours can only perpetuate on the landward side of the *Jensen* line, the same confusion that previously existed on the seaward side. While we have no doubt that Congress had the power to choose either of these paths in defining the coverage of its compensation remedy, the plain fact is that it chose instead the line in *Jensen* separating water from land at the edge of the pier. The invitation to move that line landward must be addressed to Congress, not to this Court.

396 U.S. at 223–24, 90 S.Ct. at 354. The Court contemplated at least two possibilities: an extension of the LHWCA to cover longshoremen injured on a pier "while loading or unloading a ship," or an extension to "coincide with the limits of admiralty jurisdiction." In the ab-

sence of clarifying legislative history, we would have no idea which set of evils referred to in *Nacirema* Congress was endeavoring to overcome.

19. In the *Blundo* case the petitioner, I.T.O. makes a halfhearted argument that Blundo was not injured on the navigable waters within the expanded definition because the 19th Street pier on which he was injured was not used for the loading or unloading of vessels. This argument flies in the face of the statute, which reads ". . . including *any* adjoining pier . . . *or other adjoining area* customarily used by an employer in loading, unloading, repairing, or building a vessel." (Emphasis added.) It would seem that any pier next to the water is included within the situs definition. Accord, *I.T.O. Corp. of Baltimore v. Adkins, supra*, 529 F.2d at 1083–84. The testimony before the ALJ established that Blundo was injured at one of two "finger" piers which jutted into the water from the terminal. The entire terminal adjoined the water and was enclosed by a single gate. The finger pier at 21st Street was used for vessels; the finger pier at 19th Street was used to load and unload containers. Blundo was clearly on a "pier" and a "terminal" adjoining the water, a part of which was used for loading and unloading vessels. This is sufficient.

**52**

all worked for covered "employers" under the Act; the question is whether each—now Blundo and Caputo—was a "person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations . . . ." § 902(3).[20]

If there were any doubt on the face of the statute, the legislative history makes clear that § 902(3), as here relevant, is to be construed no differently than if it said "any longshoreman or other person engaged in longshoring activity or engaged in other maritime employment." Cf. *Argosy Limited v. Hennigan,* 404 F.2d 14, 20 (5 Cir. 1968); *United States v. Gertz,* 249 F.2d 662, 666 (9 Cir. 1957). The Senate Committee on Labor & Public Welfare stated, Sen.Rep.No. 92–1125, 92d Cong.2d Sess., at 13:

> It is apparent that if the Federal benefit structure embodied in Committee bill is enacted, there would be a substantial disparity in benefits payable to a permanently disabled longshoreman, depending on which side of the water's edge the accident occurred, if State laws are permitted to continue to apply to injuries occurring on land. It is also to be noted that with the advent of modern cargo-handling techniques, such as containerization and the use of LASH-type vessels, more of the longshoreman's work is performed on land than heretofore.
>
> The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide coverage of longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other employees engaged in maritime employment (excluding masters and mem-

bers of the crew of a vessel) if the injury occurred either upon the navigable waters of the United States or any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other area adjoining such navigable waters customarily used by an employer in loading, unloading, repairing, or building a vessel.

The House Committee Report, No. 92–1441, 92d Cong.2d Sess. contained identical language.

Secondly, and more important, Congress perceived a need to provide expressly for coverage for "any longshoreman" in addition to what it had established for a person engaged in "longshoring operations." A "longshoreman" may thus be covered at some times even when he is not engaged in traditional longshoring activity. This alone is sufficient to condemn the "point of rest" doctrine. Petitioners concede that persons engaged in moving unloaded cargo to its first point of rest or moving cargo to be loaded from its last point of rest are engaged in "longshoring operations." If they alone were to be covered, there was no need to provide also for "any longshoreman."

What then did Congress mean by that phrase? Obviously it is not enough that a claimant calls himself a longshoreman or that a longshoreman's union in a particular port has forced employers to hire its members for such unlongshoreman-like positions as clerks or guards. But see *Weyerhaeuser v. Gilmore, supra,* 528 F.2d at 962.

The reports of the Senate and House committees go a long way toward supplying an answer. Immediately after the two paragraphs quoted above came the following:

> The intent of the Committee is to permit a uniform compensation system to

---

**20.** Judge Craven, dissenting from the panel opinion in *I.T.O.,* advanced the argument, although he did not base his conclusion on it, that this phrasing might make the inquiry too narrow, since § 902(3) also includes "any harborworker," 529 F.2d at 1090 n. 3. He cited the statement in 1 *Norris, The Law of Maritime Personal Injuries* § 3 (3d ed. 1975), that the longshoreman is only "[f]irst in the catalogue

of harbor workers." Arguably, however, Congress intended "harbor workers" to refer only to persons similar to those specifically described ("any harborworker including a ship repairman, shipbuilder, and shipbreaker") and not to persons concerned with the movement of cargo. But see Norris, *supra,* § 5. Like Judge Craven we find it unnecessary to decide the point.

apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment. Likewise the Committee has no intention of extending coverage under the Act to individuals who are not employed by a person who is an employer, i. e. a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment. Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters.

Two conclusions emerge from this with seeming certainty: One is that Congress was concerned about "the advent of modern cargo-handling techniques, such as containerization and the use of LASH-type vessels," new facts of life on the waterfront which, as this court noted in *Intercontinental Container Transport Corp. v. New York Shipping Ass'n*, 426 F.2d 884, 886 (2 Cir. 1970), mean that a good deal more of the longshoreman's traditional jobs are now performed on shore. Stripping a container of goods destined to different consignees is the functional equivalent of sorting cargo discharged from a ship; stuffing a container is part of the loading of the ship even though it is performed on shore and not in the ship's cargo holds. Congress intended to cover men engaged in these activities if they met the situs test contained in the Act—irrespective of the employee's position vis-à-vis a "point of rest." The committees said expressly that "checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment." Congress did not say they were covered only if they unloaded the container at the spot where a crane had first deposited the container or loaded it at a place on the water's edge; one of the advantages of containers is that they permit loading or unloading to be done at less congested locations. It sufficed for coverage if an accident arising from the stripping or stuffing of containers occurs at a place within the situs test. One answer to petitioners' argument that stuffing or stripping a container on a pier is no different from doing the same job a mile away is that Congress may have doubted its power, under the admiralty clause of Article III, to go further than it did. This would decide Blundo's case if he had been "checking" the container at the pier where it was first deposited even if it had been moved several times. We fail to perceive any significant difference because, for the convenience of someone, it had been moved to another pier. The cargo had not yet been delivered to the consignee; the unloading process still had not been completed.[21]

21. As many admiralty cases have decided, in construing other doctrines of maritime law, a realistic view of the loading or unloading process recognizes that it does not stop as soon as the cargo first hits the pier on being removed from a vessel, nor does it begin only when the cargo stands on the pier next to the vessel on which it is about to be loaded. See *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 214 at n. 14, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), *rev'g on other grounds, Law v. Victory Carriers, Inc.*, 432 F.2d 376 (5 Cir. 1970). Frequently large gangs of longshoremen, dozens of men, are assigned different tasks in a continuous proc-

The second conclusion is that Congress was concerned with providing uniformity of coverage for persons engaged in the loading or unloading functions on the piers. It wished to minimize the occasions when longshoremen and other harbor workers would be walking from the liberalized benefits of LHWCA to the much lower ones provided by state compensation laws.[22] Petitioners argue that Congress was concerned with providing uniformity only in the *Nacirema* situation, where the same employee engaged in the same unloading or loading operation would have been protected by the federal statute if a draft of cargo hit him while he was on the ship but not if his injury occurred on the pier itself, and point to the fact that the illustration used by the committees was a case where cargo is "unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters." But the committees stated their intention more broadly—"to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity." The concern for uniformity was not limited to rectifying the disparity between the longshoreman making up the draft on the ship and the longshoreman receiving it on the pier; it extended to the disparity that would result if a line were drawn between the latter and a longshoreman, perhaps the very same one, who moved the unloaded cargo to another place on the pier.[23] The committees' language clearly is broad enough to cover a person like Caputo who spent a significant part of his time in working on vessels, so long as he did not come within the category mentioned as being excluded—employees who are not engaged in loading or unloading a vessel, "[t]hus, employees whose responsibility is only to pick up stored cargo for further trans-shipment."

Petitioner asserts that Caputo came within both descriptions of excluded persons. Clearly he did not come within the second. His responsibility was to perform a variety of jobs on the pier, on both sides of the "point of rest," including going on vessels. Also we would not regard the cargo as "stored" within the committees' meaning simply because the consignee had delayed five days in picking it up.[24] The question whether he was engaged in loading or unloading (here unloading) is closer. If his injury had occurred while he was moving the boxes of cheese from a previous position on the pier to the consignee's trucks, he clearly would have been engaged in "unloading," in the way that term is used in ordinary speech. That being so, it would be wholly artificial to draw a distinction because his injury occurred while he was inside the consignee's truck. See note 21, *supra*. To be sure, the carrier would probably have fulfilled its legal duty if it had instructed the stevedores simply to place cargo alongside consignees' trucks and leave the loading of the trucks to them. But, so far as we can gather from this meagre record, that is not the life of the waterfront. The driver needs help in loading or unloading his truck, it would be

---

ess which moves cargo off a vessel ultimately to a warehouse or storage area at the far end of the pier or terminal. *Garrett v. Gutzeit*, 491 F.2d 228 (4 Cir. 1974).

**22.** Joseph Leonard, Safety Director of the ILA, in speaking to the House Committee about the former coverage provisions, asked, "What do we do, cut ourselves in half?" Hearings on H.R. 247, H.R. 3505, H.R. 12006, and H.R. 15023 (Longshoremen's & Harbor Worker's Compensation Act Amendments of 1972), before the Select Subcomm. on Labor of the House Comm. on Educ. & Labor, 92d Cong., 2d Sess., 297.

**23.** Congress also expressed interest in extending federal coverage to as many longshoremen as possible to avoid the "disparity in benefits payable . . . for the same type of injury depending on . . . in which State the accident occurs." Senate Committee Report, *supra*, at 12.

**24.** We thus are not required to decide whether cargo should ever be regarded as "stored" so long as it remains on the pier in the custody of the stevedore employed by the vessel rather than being placed in a public warehouse. Dellaventura's case, where there was a delay of 133 days, might have demanded such a decision.

uneconomical for him to carry a sufficient supply of helpers, everyone wants the truck off the pier as soon as possible, so the stevedores have their employees lend a hand. It is not clear whether an additional charge is collected for this, but we not think it matters. Neither do we think it matters that the stevedore might not be liable for mishandling by a longshoreman within the truck.

Petitioners make a significant argument that the high benefits under the Amendments were provided because of the extremely hazardous nature of longshoring and that these extraordinary hazards no longer exist once the cargo is beyond the "point of rest." Indeed, in Caputo's case the parties stipulated that what Caputo was doing was the same, and entailed the same risk of injury, as exists wherever and by whomsoever trucks are loaded or unloaded with dollies. The Senate Report, p. 2, refers to "high-risk occupations such as those covered by this Act" and says that "[l]ongshoring, for example, has an injury frequency rate which is well over four times the average for manufacturing operations." What we do not know is what types of operations were considered to be longshoring for the purpose of these calculations. Also, as shown by the case of Blundo, who slipped on ice while he was checking the contents of a container that was being stripped on a pier other than the one where the vessel was unloaded, unusual hazards can exist due to the exposure of piers to the elements which would not exist in a manufacturing plant or in a garage or warehouse where containers removed from trucks were being stripped. Doubtless the hazards of longshoring vary with the particular tasks being performed, and may in some instances be no greater than those encountered by persons doing similar work in places other than piers or terminals adjoining the water's edge.[25] However all this may be, we find nothing in the words of the statute or its legislative history that would enable us to construct a "hazard" test; Congress' intention was rather to provide uniformity of coverage for workers injured while engaged in the process of loading or unloading ships who met the situs test. We note in this connection that the increased benefits inure to shipbuilders meeting the situs test, although much of their work is performed in facilities no more hazardous than those not within the expanded definition of "navigable waters" and that the benefit schedules of LHWCA apply to all industrial accidents in the District of Columbia, Act of May 17, 1928, ch. 612, 45 Stat. 600 (1928), 36 D.C.Code § 501 (1973).

In a variation of the argument last considered, petitioners contend that because of the higher benefits payable under LHWCA than under state compensation acts, construing the Amendments to apply beyond the point of rest will increase the already high expense of stevedores to an extent that Congress could not have intended. Clearly, as explained at the outset, the act was a trade-off—a gain to the stevedores in doing away with the *Sieracki-Ryan* triangle, a gain to the workers in higher benefits and in moving the *Jensen* line shoreward. Just how much added cost Congress meant to impose on stevedores by the second part of the bargain is impossible to determine.[26] What is clear is that Congress had a profound distaste for a regime in which employees engaged in the rough and tumble

**25.** But see the statement of Representative Hicks of Massachusetts on the floor of the House. 118 Cong.Rec. 36387 (Oct. 14, 1972). And see House Hearings, *supra* note 22, at 288–89 (statement of Patrick Tobin, Internat'l Longshoremen's and Warehousemen's Union (ILWU)).

**26.** It is worth noting that the increased benefits provided by the Amendments followed recommendations of the National Commission on State Workmen's Compensation Laws (Sen. Rep., p. 4), and that Congress may well have expected that enactment of the Amendments would have an effect on state compensation laws. Hearings on S. 2318, S. 525, and S. 1547 (Longshoremen's & Harbor Worker's Compensation Act Amendments of 1972) before the Subcomm. on Labor of the Senate Comm. on Labor & Public Welfare, 92d Cong., 2d Sess., at 74 (statement of James O'Brien, Ass't Dir. Soc'l Sec. Dep't, AFL–CIO), 149 (statement of Joseph Leonard, Safety Director, ILA).

work described in the Amendments should be covered under the Federal Act at one moment and under state acts at another.

■ We therefore hold that the Amendments at least cover all persons meeting the situs requirements (1) who are engaged in stripping or stuffing containers or (2) are engaged in the handling of cargo up to the point where the consignor has actually begun its movement from the pier (or in the case of loading, from the time when the consignor has stopped his vehicle at the pier), provided in the latter instances that the employee has spent a significant part of his time in the typical longshoring activity of taking cargo on or off a vessel. That is as far as we need to go to affirm Blundo's and Caputo's awards; whether the proviso is essential can be left for another day. The facts of these cases likewise do not require us to formulate a rule for the situation wherein the goods have been deposited in a public warehouse by the stevedore in unloading or the shipper in loading.

Petitioners say, as indicated above, that in effect our construction reads the status requirement out of the Act. We concede it goes some way in that direction. But it does not do so completely; we part company with Gilmore & Black when they assert that the committee reports should be disregarded and the Amendments then "can fairly be read to cover all employment-related injuries which occur within the Act's territorial limits." The Law of Admiralty, § 6.51 at 430 (1975).[27] We believe our position avoids some of the more problematic possibilities lurking in the new "status" requirement, and accords with the liberal interpretation which must be given this remedial statute and its remedial amendments. See Comment, Broadened Coverage Under the LHWCA, 33 La.L.Rev. 683, 693 (1973).

### VI. *Constitutionality*

In so construing the Amendments we have necessarily assumed that the construc-

tion would be constitutional. We think that assumption is well founded.

It is beyond dispute that "Although containing no express grant of legislative power over the substantive law, the provision [of Article III as to admiralty and maritime jurisdiction] was regarded from the beginning as implicitly investing such power in the United States." *Panama R. R. Co. v. Johnson,* 264 U.S. 375, 386, 44 S.Ct. 391, 393, 68 L.Ed. 748 (1924). The classic definition of the jurisdiction was Mr. Justice Story's in *DeLovio v. Boit,* 7 Fed. Case No. 3776, pp. 418, 444 (C.C.D.Mass.1815), that it "comprehends all maritime contracts, torts, and injuries. The latter branch is necessarily bounded by locality; the former extends over all contracts (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations) which relate to the navigation, business or commerce of the sea." Mr. Justice Story used the broad term "locality" in his definition of the jurisdiction with respect to "torts, and injuries." Although the Supreme Court later defined locality as including only injuries suffered on navigable waters and not injuries on the land caused by a vessel, *The Plymouth,* 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1866), the Court has acquiesced in Congress' overruling that holding by the Admiralty Extension Act, 46 U.S.C. § 740, which was applied without question in *Gutierrez v. Waterman S. S. Corp.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). See also *United States v. Matson Navigation Co.,* 201 F.2d 610 (9 Cir. 1953), cited with approval in *Victory Carriers, Inc. v. Law,* 404 U.S. 202, 209 n. 9, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), in which the Court stated that "if denying federal remedies to longshoremen injured on land is intolerable, Congress has ample power under Arts. I and III of the Constitution to enact a suitable solution." *Id.* at 216, 92

---

27. They add that "a female secretary who works in a terminal warehouse should qualify as a LHCA harbor worker in exactly the same way that a female hairdresser in a cruise ship's beauty salon qualifies as a Jones Act seaman."

*Id.* We do not find the analogy persuasive. Cruise ships encounter rough weather and may even sink; terminal warehouses don't. Cf. *Mahrams v. American Export Isbrandtsen Lines, Inc.,* 475 F.2d 165 (2 Cir. 1973).

S.Ct. 418, 427.[28] Most important of all are the statements in *Nacirema, supra,* 396 U.S. at 223, 90 S.Ct. at 354, that "There is much to be said for uniform treatment of longshoremen injured while loading or unloading a ship," and the suggestion that Congress be invited to do something about this, *id.* at 224, 90 S.Ct. 347. The Court would scarcely have suggested this if it had entertained doubt as to the constitutionality of a Congressional response.

We thus see no reason to question the power of Congress to expand the concept of a maritime tort to include injuries suffered by persons on structures adjoining navigable waters in the course of employment related to ships. If we were more doubtful on the point than we are, we would see no reason why the extension of coverage could not be predicated on the portion of the jurisdiction relating to maritime contracts, where there is no "locality" test. Contracts of employment relating to maritime matters are within that jurisdiction, *Sheppard v. Taylor,* 30 U.S. (5 Pet.) 675, 8 L.Ed. 269 (1831), and claims under LHWCA are by an employee engaged in "maritime employment" against an employer.

The petition to review in Dellaventura's case is dismissed as untimely and the petition in Scaffidi's case is dismissed on the ground that there no longer is a justiciable controversy between the employer and the employee. The petitions in Blundo's and Caputo's cases are denied on the merits.

LUMBARD, Circuit Judge (concurring and dissenting):

I agree that Pittston's petition seeking review of the award in Scaffidi's case should be dismissed as there is no justiciable controversy by reason of the insurance carrier's payment of the award. I also agree that Pittston's petition to review Dellaventura's case should be dismissed as untimely filed.

With respect to the denial of the petitions in the *Blundo* and *Caputo* cases, I respectfully dissent. As the relevant considerations have been so ably and extensively set forth here by Judge Friendly and also by Judge Winter in *I.T.O. of Baltimore v. Benefits Review Board, U. S. Dep't of Labor and Adkins,* 529 F.2d 1080 (4th Cir. 1975), no purpose would be served in any further protracted discussion. I agree with Judge Winter that "[t]he 1972 extension of coverage was intended only to remove inequities and anomalies arising when a person otherwise engaged in 'maritime employment' was injured on land," 529 F.2d at 1081, and with his additional statement that ". . . with respect to longshoremen or other persons engaged in longshoring operations, the Amendments extend only to those employees engaged in loading and unloading activities between the ship and the first (last) point of rest, including checkers 'directly involved in [such] loading or unloading functions,'" 529 F.2d at 1088.

It is more in keeping with the realities of maritime employment to draw the line at the first point of rest in discharging the cargo and at the last point of rest in loading a vessel. Moreover, such a rule is far easier to apply and avoids claims such as that put forward by Dellaventura that he is entitled to compensation for his injury while loading a consignee's truck with coffee bags which had been stored in a warehouse for 133 days after being removed from the ship CAMPECHE. This being so, it seems to me that the interpretation adopted by the Fourth Circuit is more consistent with what the Congress intended and with the language of the 1972 amendment.

Blundo, a checker employed by I.T.O., was injured while checking cargo being removed from a container. The container was located on a stringpiece of the 19th Street pier in Brooklyn, had been unloaded a few days before at a different pier and

---

**28.** The Court has also sustained the Jones Act, which accords to seamen a remedy for injuries on land as well as on the sea, as an extension of the remedy of maintenance and cure. *O'Donnell v. Great Lakes Dredge & Dock Co.,* 318 U.S. 36, 40–41, 63 S.Ct. 488, 87 L.Ed. 596 (1943). If *Sieracki* retains any vitality, the constitutionality of the extension of coverage by the Amendments could be supported on this theory.

58

had been trucked through the streets to the 19th Street pier to be opened there by United States Customs before the container was stripped. What Blundo did was done well after the container had been left at the first point of rest.

Caputo's principal duties related to terminal labor. When injured he was working at the northeast marine terminal on the Brooklyn waterfront inside the truck of a consignee, while helping the consignee's truck driver load boxes of cheese which had been discharged from a vessel at least five days before. Thus in Caputo's case his activity occurred after the boxes of cheese had come to rest on the pier.

For these reasons I would grant the petition and set aside the awards in the cases of Blundo and Caputo.