537 F.2d 706
 92 L.R.R.M. (BNA) 3260, 79 Lab.Cas. P 11,496
 INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO and New
York Shipping Association, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Twin Express, Inc., Intervenor,
and
Consolidated Express, Inc., Intervenor,
and
Truck Drivers Union Local 807, IBT, Intervenor.
 Nos. 802, 803, Dockets 75--4266, 76--4003.
 United States Court of Appeals,
Second Circuit.
 Argued March 17, 1976.
Decided June 29, 1976.
 
 Thomas W. Gleason (Herzl S. Eisenstadt), New York City, for petitioner, ILA, AFL-CIO.
 Constantine P. Lambos, (Jacob Silverman, Donato Caruso, Lorenz, Finn, Giardino & Lambos), New York City, for petitioner, NYSA.
 Howard E. Perlstein, Washington, D.C. (John S. Irving, Jr., John E. Higgins, Jr., Elliott Moore, Robert A. Giannasi, NLRB, Washington, D.C.), for respondent.
 
 
 1
 Allan I. Mendelsohn (Glassie, Pewett, Beebe & Shanks), Washington, D.C. for intervenor, Twin Express, Inc.
 
 
 2
 Martin Schneiderman, (Samuel T. Perkins, Steptoe & Johnson), Washington, D.C., for intervenor, Consolidated Express, Inc.
 
 
 3
 J. Warren Mangan, Long Island City, N.Y., for intervenor, Truck Drivers Union Local 807, IBT.
 
 
 4
 Bruce H. Simon (Cohen, Weiss & Simon), New York City, for amicus curiae, Local 707, IBT.
 
 
 5
 Howard Schulman, (Schulman, Abarbanel & Schlesinger), New York City, for amicus curiae, Maritime Port Council of Greater New York and Vicinity.
 
 
 6
 Before MOORE, Senior Circuit Judge, FEINBERG, Circuit Judge, and WYZANSKI, Senior District Judge.*
 
 WYZANSKI, Senior District Judge:
 
 7
 This case is here on joint petitions for review filed by the International Longshoremen's Association, AFL-CIO (ILA) and the New York Shipping Association, Inc. (NYSA) and on a cross-application for enforcement filed by the NLRB. All involve an order issued by the NLRB on December 4, 1975. See 221 NLRB No. 144. Twin Express, Inc. and Consolidated Express, Inc. and Truck Drivers Union Local 807, IBT intervened in this court in support of the order.
 
 
 8
 The statutory framework for this case is supplied by Section 8(e) and Section 8(b)(4)(ii)(B) of the NLR Act. 29 U.S.C. § 158(e) and (b)(4)(ii)(B). Section 8(e) provides that it is an unfair labor practice for a labor organization and an employer
 
 
 9
 'to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void . . .'
 
 
 10
 Section 8(b)(4)(ii)(B), so far as relevant, provides that it is an unfair labor practice for a union
 
 
 11
 'to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an objective thereof is--
 
 
 12
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any person . . .: Provided, that nothing contained in this clause (B) shall be construed to make unlawful . . . any primary strike or primary picketing;'
 
 
 13
 Loosely stated, the complaint underlying this controversy arises from activities of ILA and NYSA having the object of giving to New York longshoremen represented by ILA the right when containers arrive at a New York dock to remove cargo from such containers although they have been loaded by consolidators and to reload them, before the container is laded, and also to remove cargo from containers destined for consolidators and to reload the cargo before such containers are turned over to consolidators.
 
 
 14
 There is no dispute as to the objective facts in this case. The record is unambiguous, and indeed the situation is one with which this court is not unfamiliar.[1]
 
 
 15
 In the proceedings here under review, the charging parties before the NLRB were Consolidated Express, Inc. and Twin Express, Inc. Each is a non-vessel-owning common carrier engaged in the business of containerizing less-than-container-load (LCL) or less-than-trailer-load (LTL) cargo for shipment between Puerto Rico and its inland facility located within 50 miles of the Port of New York. Each is rightly described as a 'consolidator' because at its off-pier facilities it consolidates crates of its customers into large containers or trailers provided by steamship companies.
 
 
 16
 Consolidators such as the charging parties truck their trailers to the pier-side facilities of the steamship companies which then load the containers onto their ships bound for Puerto Rico. Conversely, when ships carrying goods from Puerto Rico arrive in New York, steamship companies unload the income containers, including the LCL containers, which the consolidators then truck to their off-pier facilities where the consolidators open the containers and separate the crates for delivery to the ultimate consignees. In the trade, the act of filling a container with cargo is known as 'stuffing,' and the act of removing cargo from a container is known as 'stripping' or 'unstuffing.'
 
 
 17
 As already indicated, the grievances charged arise from the activities and agreements of ILA and NYSA traceable to ILA's claim that employees represented by it shall have the right at the pier to stuff or to strip every container carried by a ship owned or chartered by a member of NYSA loading or unloading at the Port of New York. This claim is based upon ILA's contention that its members traditionally performed at the pier the work of stuffing and stripping, and that the activities and agreements to which the charging parties object are designed to preserve work to which ILA-represented employees working in the Port of New York were entitled.
 
 
 18
 The record before the NLRB shows that the introduction of increasingly larger containers, currently as large as 8 $ 8 $ 40 feet, resulted in fewer individual cargo units for the longshoremen to load onto and off the ships.
 
 
 19
 In 1958, ILA protested the use of Dravo containers, boxes which were 8 cubic feet in size, and commenced a strike against NYSA.
 
 
 20
 But in 1959, NYSA and ILA reached an agreement which provided that:
 
 
 21
 'a. Any employer shall have the right to use any and all type of containers without restriction or stripping by the union.
 
 
 22
 b. The parties shall negotiate for two weeks after the ratification of this agreement, and if no agreement is reached shall submit to arbitration . . . the question of what should be paid on containers which are loaded or unloaded away from the pier by non-ILA labor, such submission to be within 30 days thereafter.
 
 
 23
 c. Any work performed in connection with the loading and discharging of containers for employer members of NYSA which is performed in the Port of Greater New York whether on piers or terminals controlled by them, or whether through direct contracting out, shall be performed by ILA labor at longshore rates.'
 
 
 24
 Thereafter, in accordance with the agreement, the longshoremen did not, for a time, insist, as they had during the strikes, on stripping the cargo from containers and restuffing them. They allowed containers to cross the New York docks without rehandling. Yet when ILA-NYSA collective-bargaining contracts expired, and there were not yet new agreements, the ILA members insisted on stripping and restuffing containers which were delivered by or to the consolidators.
 
 
 25
 By 1967, technology had so advanced that fully containerized ships were used to carry large containers. This caused ILA to renew its demand that its longshoremen stuff all containers crossing the piers. A 57-day strike followed. In 1969, in an attempt to resolve their differences, ILA and NYSA entered into an agreement known as the 'Rules of Containers,' which provided as follows:
 
 
 26
 Rule 1. Definitions and rule as to containers covered. Stuffing--Means the act of placing cargo into a container.
 
 
 27
 Stripping--Means the act of removing cargo from a container.
 
 
 28
 Loading--Means the act of placing containers aboard a vessel.
 
 
 29
 Discharging--Means the act of removing containers from a vessel.
 
 
 30
 These provisions relate solely to containers meeting each and all of the following criteria:
 
 
 31
 (a) Containers owned or leased by employer-members (including containers on wheels) which contain LTL loads or consolidated full container loads.
 
 
 32
 (b) Such containers which come from or go to any person (including but not limited to a consolidator who stuffs containers of outbound cargo or a distributor who strips containers of inbound cargo and including a forwarder, who is either a consolidator of outbound cargo or a distributor of inbound cargo) who is not the beneficial owner of the cargo.
 
 
 33
 (c) Such containers which come from or go to any point within a geographical area of any port in the North Atlantic District described by a 50-mile circle with its radius extending out from the center of each port.
 
 
 34
 Rule 2. Rule of stripping and stuffing applies to such containers.
 
 
 35
 A container which comes within each and all of the criteria set forth in Rule 1 above shall be stuffed and stripped by ILA longshore labor. Such ILA labor shall be paid and employed at longshore rates under the terms and conditions of the General Cargo Agreement. Such stuffing and stripping shall be performed on a waterfront facility, pier or dock. No container shall be stuffed or stripped by ILA longshore labor more than once. Notwithstanding the above provisions, LTL loads or Consolidated Container loads of mail, of household goods with no other type of cargo in the container, and of personnel (sic) effects of military personnel (sic) shall be exempt from the rule of stripping and stuffing.
 
 
 36
 Rule 3. Rules on No Avoidance or Evasion.
 
 
 37
 (e) Failure to stuff or strip a container as required under these rules will be considered a violation of the contract between the parties. Use of improper, fictitious or incorrect documentation to evade the provisions of Rule 2 shall also be considered a violation of the contract. If for any reason a container is no longer at the waterfront facility at which it should have been stuffed or stripped under the rules, then the steamship carrier shall pay, to the joint Container Royalty Fund liquidated damages of $250 per container which should have been stuffed or stripped. Such damages shall be used for the same purposes as the first Container Royalty is used in each port. If any carrier does not pay liquidated damages within 30 days after exhausting its right to appeal the imposition of liquidated damages to the Committee provided in (g) below, the ILA shall have the right to stop working such carrier's containers until such damages are paid.
 
 
 38
 In 1970, NYSA agreed to increase the liquidated damages imposed upon the offending carriers to $1,000 for each offense. The disputes continued, however, and in 1973, the Council of North American Shopping Associations and ILA met and entered into the Dublin Supplement which provided in pertinent part as follows:
 
 
 39
 Enforcement of Rules on Containers.
 
 
 40
 1. (a) All outbound (export) consolidated or LTL container loads (Rule 1 containers) shall be stripped from the container at pier by deepsea ILA labor and cargo shall be stuffed into a different container for loading aboard ship.
 
 
 41
 1. (b) All inbound (import) consolidated or LTL cargo (Rule 1 containers) for distribution shall be stripped from the container and the cargo placed on the pier where it will be delivered and picked up by each consignee.
 
 
 42
 2. No carrier or direct employer shall supply its containers to any facilities operated in violation of the Rules on Containers including but not limited to a consolidator who stuffs containers of outbound cargo or a distributor who strips containers of inbound cargo and including a forwarder who is either a consolidator or a distributor. No carrier or direct employer shall operate a facility in violation of the Rules on Containers which specifically requires that all containers be stuffed or stripped at a waterfront facility (pier or dock) where vessels normally dock.
 
 
 43
 A list shall be maintained of consolidation and distribution stations which are operated in violation of the Rules for the information of all carriers and direct employers. Any container consolidated at or distributed from such facilities shall be deemed a violation and subject to the rules on stuffing and stripping.
 
 
 44
 After the Dublin Supplement, Sea-Land Service, Inc., Seatrain Lines, Inc., and Transmerican Trailer Transport, Inc., each being a member of NYSA who operates specially designed container ships between New York and Puerto Rico, confronted the choice of paying wages to ILA labor for stripping and restuffing containers sent by Consolidated and Twin, or paying damages assessed by ILA. On some occasions the three companies elected not to pay such wages to ILA. Thereafter the ILA assessed against each company damages amounting in total in the case of the first two companies of over $100,000 each, and in the case of TTT of a smaller sum. Then each company stopped supplying its empty containers to the consolidators. We need not pursue the details; it is uncontested that on April 13, 1973 NYSA and ILA issued to all NYSA members a joint notice announcing that steamship lines had been assessed damages for violating the rules with respect to containers stuffed or stripped at the premises of Consolidated or Twin, or other consolidators.
 
 
 45
 June 1, 1973 Consolidated filed with the NLRB two sets of unfair labor practice charges. The first alleged that ILA had violated the secondary boycott provisions of the Act, Section 8(b)(4)(ii)(B). The second alleged that, by maintaining and enforcing the supplemental Rules on Containers, NYSA had violated the hot cargo provisions of the Act, Section 8(e). August 23, 1973 the NLRB issued a consolidated complaint based on those two sets of charges.
 
 
 46
 November 2, 1973 Twin Express, Inc. filed parallel charges, which led the NLRB on January 3, 1974 to issue a parallel complaint. The NLRB consolidated the two cases. The NLRB permitted Truck Drivers Union Local 807, IBT to intervene.
 
 
 47
 The Administrative Law Judge rejected the complaints; but the NLRB reversed and sustained them. It found that ILA and NYSA, by enforcing the Rules on Containers as supplemented, had violated Section 8(e) of the Act, and that, by assessing liquidated damages against Sea-Land, Seatrain, and TTT, have violated Section 8(b)(4)(ii)(B) of the Act. By its December 4, 1975 order, here under review, the NLRB required ILA and NYSA to cease enforcing the Rules on Containers as supplemented to the extent that they had been found unlawful, or any like agreement. The order also required ILA to cease restraining NYSA or any of its members or others in interstate commerce where the object is to require any of them to cease doing business with Consolidated or Twin. Furthermore, the order provided for familiar types of notice.
 
 
 48
 The opinion of the NLRB seems to us to state the essence of the matter clearly, succinctly, and correctly. The following parts of the opinion seem to us controlling and convincing:
 
 
 49
 '(. . . T)he disposition of this case turns on whether ILA's activities and its contractual agreements with NYSA had primary or secondary objectives. If ILA's activities and its agreements with NYSA were designed to preserve work to which ILA-represented employees working in the Port of New York were entitled, then both the activities and the contractual arrangements would be primary in purpose and, therefore, would not be unlawful. However, if ILA's real object was to obtain either work traditionally performed by employees not represented by ILA or work to which ILA had abandoned all claims, then the pressures on NYSA members and the contractual arrangements, would have a secondary object and would violate Section 8(b)(4)(ii)(B) and 8(e), respectively. As the United States Supreme Court instructed in National Woodwork Manufacturers Association v. N.L.R.B., '(t)he touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees.'[15]
 
 
 50
 (. . . I)n order to properly evaluate the validity of ILA's claim to the work 'it is essential to define with some precision the work in controversy since that is the predicate upon which the issue of work preservation must turn.' It is clear from the record that the work in controversy here is the LCL and LTL container work performed by Consolidated and Twin at their own off-pier premises. It is with this precise work in mind that the contentions of the parties must be evaluated.
 
 
 51
 The traditional work of the longshoremen represented by ILA has been to load and unload ships. When necessary to perform their loading and unloading work, longshoremen have been required to stuff and strip containers on the piers. (Footnote omitted.)
 
 
 52
 Similarly, for many years, maritime cargo has been sorted and consolidated off the docks by companies employing teamsters and unrepresented employees. With the advent of vessels designed exclusively to carry the large containers presently in use, these consolidating companies such as Consolidated and twin, have continued to consolidate shipments into containers prior to their placement aboard the vessels. The consolidators generate such work themselves, performing it not on behalf of the employer-members of NYSA but for their own customers who have goods to ship. Furthermore, they perform this consolidation work at their own off-pier premises, with their own employees who are outside the unit represented by ILA, and who fall within the coverage of separate collective-bargaining agreements, under which they are represented by other labor organizations. It is clear, therefore, that Consolidated and Twin have traditionally been engaged in the work of stuffing and stripping containers such as are here in controversy.
 
 
 53
 From the foregoing and the record as a whole, it is clear that the on-pier stripping and stuffing work performed by longshoremen as an incident of loading and unloading ships does not embrace the work traditionally performed by Consolidated and Twin at their own off-pier premises. It does not fall within ILA's traditional role to engage in make-work measures by insisting upon stripping and stuffing cargo merely because that cargo was originally containerized by nonunit personnel. Yet, ILA's demand here could only be met if the work traditionally performed off the pier by employees outside the longshoremen unit were taken over and performed at the pier by longshoremen represented by ILA.'
 
 
 54
 What we have quoted is supported by substantial evidence and by sound analysis and is sufficient to sustain the Board's December 4, 1975 order in full, and to justify its enforcement as prayed.
 
 
 55
 We are not similarly impressed with the NLRB's other reasons for its order, such as the alleged abandonment by ILA of its claims. However, such points are moot in view of the ground we have given for enforcement of the order.
 
 
 56
 December 4, 1975 Order of the NLRB enforced as prayed in the NLRB's cross-application; petitions of ILA and NYSA denied.
 
 FEINBERG, Circuit Judge (dissenting):
 
 57
 I dissent.
 
 
 58
 The decision of the Board in this case that petitioners ILA and NYSA violated section 8(e) of the National Labor Relations Act and that ILA also violated section 8(b)(4)(ii)(B) rests upon a fundamental error. The Board recognized in its opinion that a labor contract that seeks to preserve work traditionally done in the bargaining unit does not violate section 8(e). National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Whether work preservation is actually the objective of a contract provision is frequently difficult to resolve, see, e.g., NLRB v. National Maritime Union of America, 486 F.2d 907 (2d Cir. 1973), cert. denied, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974), and whether union pressure has an improper object is usually a question of fact. Bedding, Curtain and Drapery Workers Union v. NLRB, 390 F.2d 495, 499 (2d Cir.), cert. denied, 392 U.S. 905, 88 S.Ct. 2056, 20 L.Ed.2d 1363 (1968). Ordinarily, therefore, the Board's determination of such an issue is entitled to great weight. But in this case, the Board's decision that work preservation was not the union objective rests upon a basic error of law, which is highlighted in the portion of the Board opinion quoted by my brothers.
 
 
 59
 '(I)t is essential,' according to the Board, 'to define with some precision the work in controversy' since that is basic to the issue of work preservation. The Board then defines the 'work in controversy' as
 
 
 60
 the LCL and LTL container work performed by Consolidated and Twin at their own off-pier premises.[1]
 
 
 61
 This definition is incorrect because it focuses on the work done in the past by the intervening complaining parties, Twin Express, Inc. and Consolidated Express, Inc., rather than on the work done in the past by the longshoremen represented by ILA. The Administrative Law Judge in this case, former Board General Counsel Arnold Ordman, did not fall into this error. In his thorough opinion dismissing the complaint against ILA and NYSA, he stated:
 
 
 62
 Work preservation agreements usually come into being because the work sought to be protected has been subjected to invasion or threat of invasion by others. Thus, in National Woodwork itself, the carpenters employed by the employer refused to install precut doors unless the doors were cut on the jobsite by the carpenters themselves. The carpenters had traditionally performed that work themselves. Yet, obviously the employees of the door manufacturers who comprised the National Work Manufacturers Association did that work also. Had the Supreme Court focused on the work being done by the employees of the door manufacturers at the latter's plants, as General Counsel urge be done here with respect to the operations of Consolidated and Twin, then obviously the Supreme Court would have reached a different result in National Woodwork. Indeed, the legitimacy of a work preservation objective would be virtually precluded in any situation where it could be established that other employees at other sites were doing or had done the work for which protection was being sought.[2]
 
 
 63
 The question before the Board was: What work was it that ILA and NYSA were allegedly attempting to preserve? If the Board was free to define the work in question as the off-pier consolidation into containers of LCL/LTL cargo, the case is indeed an easy one and the Board's decision is correct. But if the work is defined as the work the ILA members used to do on the pier before containerization moved most of it off the pier, the case takes on a different cast. As the Administrative Law Judge noted, just as it would have been improper in National Woodwork to define the work in controversy as work on the pre-cut doors, it is wrong here to define the work in controversy as off-pier container stuffing. The Administrative Law Judge found that
 
 
 64
 virtually all solid cargo moving over the docks in the Port of New York had for decades been handled on a piece-by-piece basis by longshoremen and employees in related crafts who worked on the docks and were represented by ILA. Typically, that work included the preparation of cargo for shipment by the making up and loading of cargo on drafts, pallets and boxes for export, and the breaking down of such cargo from incoming ships for delivery to the consignees.[3]
 
 
 65
 The technology of containerization, by making possible the consolidation of cargo off the piers into large containers which can be loaded onto specially-designed ships by fewer workers than were required by piece-by-piece loading, has 'reduced substantially the need for longshore and other labor.'[4]
 
 
 66
 Understandably, ILA resisted the new technology. For at least two decades, there has been a struggle over technological improvement in which longshoremen have attempted to keep jobs on the pier that are threatened by modernization. National Woodwork teaches that conflicts between workers and employers over this problem are to be resolved by collective bargaining, and that the resulting pressure by unions and collective bargaining agreements do not violate sections 8(b)(4)(ii)(B) and 8(e).
 
 
 67
 Some would no doubt disagree with our present national labor policy, expressed in National Woodwork, that problems caused by automation of the workplace are best resolved through collective bargaining. But for the present that is our policy, and it permits work preservation agreements even if they cause economic hardship to third parties. The Board cannot be permitted to frustrate this policy in the guise of making factual findings. Yet that is the result of enforcing the Board's order in this case. The carefully constructed collective bargaining agreements and rules which were the result of hard bargaining and contending economic pressures, see Intercontinental Container Transport Corp. v. New York Shipping Ass'n, 426 F.2d 884, 888 (2d Cir. 1970), are now set aside. Whether that will result in chaos and economic hardship in the Port of New York, as some of the parties predict,[5] is not for us to resolve. But it is our province to decide whether the result is legally sound. I believe it is not, because the Board committed an error of law by focusing on the wrong 'work' in deciding whether ILA and NYSA were protected by the National Woodwork work preservation doctrine. Therefore, I would not enforce the Board's order.
 
 
 
 *
 Senior District Judge of the District of Massachusetts, sitting by designation
 
 
 [1]
 Compare Intercontinental Container Transport Corporation v. New York Shipping Assn., 426 F.2d 884 (C.A. 2, 1970). There the holding was that the District Court was not justified in granting a preliminary injunction upon a complaint by a container corporation (whose business was assembling ships' cargo and packing it into containers and in receiving containers, unpacking them, and forwarding the contents to the various consignees) that NYSA (the same organization of steamship carriers and associated stevedores and certain employers of longshore labor involved in the case at bar) and ILA (the same union involved in the case at bar) had violated the Sherman Act by entering an agreement in which NYSA had yielded to ILA's demand that longshoremen employed on docks and piers be the only persons permitted to perform the work of stuffing and stripping containers carried by steamship carriers belonging to NYSA. Admittedly, the rationale given by the court was that in such agreement ILA was acting in its self-interest with the object of preserving for its members work traditionally performed by them as longshoremen. However, Judge Hays' opinion at p. 887, col. 1, first full paragraph, carefully distinguishes an action (such as the instant one) which is within the exclusive jurisdiction of the NLRB and which is 'based on different allegations and seeking an entirely different remedy, (where) the court must defer to the Board.'
 
 
 [15]
 386 U.S. 612, 644--645 (87 S.Ct. 1250, 1268, 18 L.Ed.2d 357) (1967). See also International Longshoremen's Association, Local 1248, AFL-CIO (U.S. Naval Supply Center), 195 NLRB 273 (1972)
 
 
 [1]
 International Longshoremen's Ass'n, 221 N.L.R.B. No. 144, at 11
 
 
 [2]
 Id., Decision of Administrative Law Judge, at 25
 
 
 [3]
 Id. at 11
 
 
 [4]
 Id
 
 
 [5]
 Brief of Petitioner NYSA, at 50; Brief of Petitioner ILA, at 43--47; Brief Amicus Curiae of Maritime Port Council of Greater New York and Vicinity, at 2--4. On the other hand, the consolidators argue that the contract provisions invalidated by the Board would put them out of business. Brief of Intervenor Consolidated Express, Inc., at 24--25; Brief of Respondent-Intervenor Twin Express, Inc., at 26--28