552 F.2d 985
 41 A.L.R.Fed. 667
 SEA-LAND SERVICE, INC., and the Travelers Insurance Company,
Petitioners,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR and Seledonio Suarez,
Respondents.
SEA-LAND SERVICE, INC. and Travelers Insurance Company, Petitioners,
v.
The DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR, and Frank
Cappelluti, Respondents.
 Nos. 76-1033, 76-1626.
 United States Court of Appeals,
Third Circuit.
 No. 76-1033 Argued Oct. 7, 1976.
No. 76-1626 Argued Oct. 8, 1976.
Decided March 17, 1977.
 
 M. E. DeOrchis, and Brian D. Starer, Haight, Gardner, Poor & Havens, New York City, for petitioners.
 
 
 1
 Angelo C. Gucciardo, Israel, Adler, Ronca & Gucciardo, New York City, for respondent Suarez in No. 76-1033.
 
 
 2
 William J. Kilberg, Sol. of Labor, Laurie M. Streeter, Associate Solicitor, Washington, D.C., for respondent Director, Office of Workers' Compensation Programs in Nos. 76-1033 and 76-1626.
 
 
 3
 Linda L. Carroll, U.S. Dept. of Labor, Washington, D.C., for respondent Director, Office of Workers' Compensation Programs in No. 76-1033.
 
 
 4
 Harry L. Sheinfeld, U.S. Dept. of Labor, Washington, D.C., for respondent Director, Office of Workers' Compensation Programs in No. 76-1626.
 
 
 5
 Thomas W. Gleason, New York City, for amicus curiae, International Longshoremen's Association, AFL-CIO.
 
 
 6
 Warren C. Farrell, Hackensack, N.J., for respondent Cappelluti.
 
 
 7
 Before VAN DUSEN and ROSENN, Circuit Judges, and CAHN, District Judge.*
 
 OPINION OF THE COURT
 
 8
 VAN DUSEN, Circuit Judge.
 
 
 9
 These are petitions by an employer and its compensation carrier to review orders[1] of the Benefits Review Board (Board) affirming two decisions of administrative law judges which found that the injured employees, Seledonio Suarez and Frank Cappelluti, came within the extended coverage of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA).[2] Because these cases involve the same employer, Sea-Land Service, Incorporated (Sea-Land) and similar questions of law in interpreting the 1972 Amendments, and were argued before the same panel during the same week, they are being decided by a single opinion. In Suarez, No. 76-1033, and in Cappelluti, No. 76-1626, the petitions for review will be granted and the cases remanded to the Board (1) with directions to vacate its orders, as well as any related administrative law judge's orders in those cases, and (2) for further proceedings consistent with this opinion.
 
 I. THE FACTS
 
 10
 (1) Sea-Land. Sea-Land is a large intermodal carrier engaging in containerized[3] water-borne and overland truck freight operations. Each claimant was injured in the course of his employment while working in different areas of Sea-Land's Port Elizabeth, New Jersey terminal facility (Terminal). This facility and the complexity of the operations conducted there were recently described by Judge Gibbons in Sea-Land Services, Inc. v. Johns, 540 F.2d 629 (3d Cir. 1976) (hereinafter Johns);[4] however, this record contains facts showing the complexity of the Terminal and the activities conducted there. The Terminal is located upon a 92 acre site lying in part along the Elizabeth Channel, a navigable waterway. It includes a general office building, marine operations center, truck operations center, garage and maintenance building, refrigerated warehouse, truck terminal, marshalling yard, freight consolidation building and vessel berths. The entire facility is intersected by a number of public streets. Ocean transportation is only one phase of Sea-Land's operations conducted at the Terminal, which is also utilized as the terminus for truck and containerized railway operations.
 
 
 11
 (2) Suarez. Suarez was injured while "stripping"[5] a container which had been brought into Building 1220.[6] Although this building is called a warehouse, it is not a storage facility;[7] it is bounded on all sides by public streets and lies about 2000 feet from the Elizabeth Channel. The building is an integral part of the Terminal and the transportation operations conducted by Sea-Land there.
 
 
 12
 At the time of his injury, November 1, 1973, the claimant had been working for Sea-Land for less than a day. On the day of the injury, Suarez first reported to his usual place of work with his usual employer, Maher Terminals, Incorporated (Maher), a stevedore. Because Maher had no work for him, he went to the union hall to ascertain if any work was available for him with another employer7a within the area. At the hall, Suarez was ordered to report to Sea-Land's Building 1220. Such assignments were made on the basis of a man's seniority and employment classification.[8] Suarez was classified as an "extra laborer" or "terminal laborer" and when working for Maher he "stripped" containers after they had been off-loaded from ships by longshoremen and he had frequent occasion to go aboard lighters to assist in the lightering of cargo to and from larger vessels. Sea-Land presented no evidence at the hearing conducted by the administrative law judge to indicate the functional organization of the work force and operations within Building 1220,[9] nor does the record clearly indicate that the work carried out there was more definitely related to any specific landward or seaward phase of Sea-Land's operations. The administrative law judge made no fact finding concerning the functional relationship of the claimant's work for Sea-Land which might have been inferred from the nature of his prior employment with Maher and the absence of countervailing testimony from Sea-Land, but concluded that:
 
 
 13
 "(The) Claimant was engaged in maritime employment and was an 'employee' as defined in Section 902(3). . . . Under the Act as amended, the process of loading or unloading a vessel is not confined to depositing cargo into the hold or moving it from the hold, but rather it encompasses all dockside handling of cargo necessary or appropriate to its continued progress in maritime commerce. (Citing Board cases) In the instant case Claimant was 'stripping' or unloading a container that had come from a ship. Claimant testified that it was the usual practice to bring containers from a ship to his work location. Respondents point out that Claimant did not see the container in question unloaded from a ship, but they offered no evidence to show this was not the case, although they were in the best position to do so. In view of the above, I find that the work being performed by Claimant was maritime employment."
 
 
 14
 Decision and Order of May 12, 1975, 74-LHCA-260 at 4 (reproduced in Joint Appendix at 8a). Upon subsequent appeal the Board affirmed[10] the administrative law judge's decision concluding inter alia :
 
 
 15
 "At the time of his accident, the claimant was stripping a container which was used to store cargo on board ship. He was doing this in a terminal which was located 1 1/2 miles from the water's edge where such containers are routinely stripped and prepared for delivery to the appropriate consignees. While unloading the container, some cargo fell on the claimant, injuring the middle finger of his right hand."The employer argues that inasmuch as the claimant was not engaged directly in the loading and unloading of ships, he was not engaged in maritime employment and therefore not within the coverage of the Act. It is well settled before the Board that an injury suffered by such a person who is engaged in shoreside activity is entitled to compensation under the extended coverage of the 1972 amendments.
 
 
 16
 '(T)he expansion of coverage to landbased employees by Congress was intended to include all persons engaged in longshoring operations, Avvento v. Hellenic Lines, BRB No. 74-153 (Nov. 12, 1974), when an injury occurs on a pier, wharf, terminal, etc. areas which have been included in the term "navigable waters" by Congress to delineate the geographic areas where employees engaged in the longshoring industry normally perform their functions. The word "employee" as defined in Section 2(3) of the Act, 33 U.S.C. § 902(3), does not require that one be "actually engaged in loading of vessels" as argued by the employer. The term includes "any longshoreman or other persons engaged in longshoring operations." Thus (even) an employee who is not classified as a longshoreman may be within the Act's coverage if he is engaged in longshoring operations'
 
 
 17
 Coppolino v. International Terminal Operating Co., 1 BRBS 205, BRB No. 74-136 (Dec. 2, 1974).
 
 
 18
 "The Board has held, and continues to hold, that such shoreside employees are covered under the 1972 Amendments to the Act. . . . In doing so, we are following the precepts prescribed in the legislative history of these amendments. See Senate Report No. 92-1125."
 
 
 19
 Board Decision of November 18, 1975, No. 75-168 at 2-3, (reproduced in Joint Appendix at 14A.)
 
 
 20
 (3) Cappelluti. Cappelluti was injured while cutting-up empty damaged containers which had been placed in the facility marshalling yard. The marshalling yard consists of numbered slots on which chassis and containers unloaded from vessels may be parked. Loaded containers may be stored there awaiting pick-up by truckers or placement aboard an out-bound vessel. Empty containers as well as damaged ones are placed in the yard prior to their repair, scrapping or utilization. The north side of the marshalling yard lies along the Elizabeth Channel and from there extends a considerable distance inland.[11] At the time the claimant was injured, various longshoring operations such as vessel unloading were proceeding in the marshalling area. These other operations were unrelated to the cutting-up of the damaged containers.
 
 
 21
 On the date of his injury, January 18, 1973, the claimant had been working for Sea-Land for approximately nine months. During that period, his work function had been limited to those operations performed in the central maintenance garage where he assisted in the repair and maintenance of truck chassis and made inspections of outgoing trucks as they passed through the inspection line.[12] The container which he was scrapping had previously been placed in the marshalling yard along with a number of others after they had been damaged while aboard a vessel, the Ross Sea, by storms at sea.
 
 
 22
 The administrative law judge found that the claimant was an "employee" within the meaning of 33 U.S.C. § 902(3) after concluding that "the Claimant's work activities, at the time of injury, (were) a complementary and necessary element for the efficient movement of maritime cargo. The 'cutting-up', i. e. salvaging and disposal of a damaged container, was the last, but integral and essential step for the efficient conduct of the longshore operation." Decision and Order of December 31, 1974 at 10 (reproduced in Joint Appendix at 14a). The Board in its review substantially adopted the findings and conclusions of the administrative law judge. See, Board Decision of June 10, 1975, No. 75-123 at 3-4 (reproduced in Joint Appendix at 4a).
 
 II. THE APPLICABLE LAW
 A. The Jurisdictional Tests
 
 23
 Before coverage under the 1972 Amendments may be extended to a claimant, he must show that the three jurisdictional tests as set forth in 33 U.S.C. §§ 902(3),[13] 902(4),[14] and 903(a)[15] have been satisfied.[16] Respectively, these sections require that the claimant have the status of a maritime employee, that the employer be a maritime employer, and that the situs of the injury be an "area customarily used by an employer in loading, unloading, repairing, or building a vessel." This court has recently examined the interwoven meanings of these sections in two opinions which control here, Dravo Corporation v. Maxin, 545 F.2d 374 (3d Cir. 1976) and Johns, supra.
 
 
 24
 In Johns, Judge Gibbons held that the section 903(a) "situs" test was essentially dependent on the function that the employee was performing for the employer using the following language:
 
 
 25
 "The reference in §§ 902(4) and 903(a) to the navigable waters of the United States should be regarded (as) no more than a shorthand way of relating the function being performed by the injured employee to water-borne transportation, the jurisdictional nexus. . . . We believe that Congress has exercised in full its legislative jurisdiction in admiralty. As long as the employment nexus (status) with maritime activity is maintained, the federal compensation remedy should be available. Resuscitating the situs requirement in cases satisfying the status test will interfere with Congress' intention to eliminate the phenomenon of shifting coverage."
 
 
 26
 "(T)he overall intention appears to be to afford federal coverage to all those employees engaged in handling cargo after it has been delivered from another mode of transportation for the purpose of loading it aboard a vessel, and to all those employees engaged in discharging cargo from a vessel up to the time it has been delivered to a place where the next mode of transportation will pick it up. A stevedore may receive cargo at one situs and move it over public streets to another situs for loading on a vessel, or may discharge cargo and transport it to a situs not immediately adjacent to a pier for delivery to a truck or rail carrier. The limits of federal coverage is defined not by reference to a geographic relationship with the navigable waters of the United States, but by the location of the interface between the air land and the water modes of transportation. If that interface is customarily located at some point remote from the pier, the fact that the stevedore uses public streets to move the cargo to or from a "terminal", a "building" or "other adjoining area" does not affect coverage. The key is the functional relationship of the employee's activity to maritime transportation, as distinguished from such land-based activities as trucking, railroading or warehousing. . . .
 
 
 27
 "The line which Congress intended to draw was between maritime commerce and land commerce, and the coverage of the federal law starts at the point where the cargo passes to or from an employer engaged in the former to an employer engaged in the latter. That the one employer may be engaged in both types of commerce is irrelevant. The line should still be drawn where cargo is delivered to a segregated place for delivery to the next mode of transportation."
 
 Id. at 638-39. (emphasis supplied.)
 
 28
 In Dravo, the court applied the Johns analysis to the carefully developed factual record, to reach its conclusion that the claimant's employment activities for Dravo were functionally within the definition of the term "shipbuilder" as used in section 902(3), the "status" test. The Dravo opinion teaches that the scope of 902(3) was not limited to activities and employees traditionally within the reach of the admiralty subject matter jurisdiction prior to the enactment of the 1972 Amendments; however, it was also emphasized that Congressional admiralty power, and hence the reach of 902(3), was bounded by a "proper conception of maritime concerns." Dravo, supra, at 378 note 4, 10. This limitation applies a fortiori where our inquiry is directed not to the limits of Congressional power but rather to the question whether the Board has observed the distinction between land and maritime occupations in awarding benefits under the LHWCA. The answer to the inquiry must turn first on the facts and inferences developed in the hearings before the administrative law judge and the Board. Without an adequate record and sufficient resolution of contradictory facts and inferences, affirming the Board would mean that our inquiry would be an essentially ad hoc labeling approach. We rejected such a restriction on our review in Dravo and in Johns. See, e. g., Dravo at 380. In Dravo the thorough fact development by the administrative law judge allowed us to readily conclude, as a matter of statutory interpretation, that the activities came under section 902(3). The fact development in each of the cases now before us does not permit such a conclusion based on administratively found facts.
 
 B. The Suarez and Cappelluti Cases
 
 29
 Suarez. The administrative law judge clearly erred in his opinion that the § 902(3) "status" test was satisfied merely because the container came from a vessel. See pages 991-992 above.[17] Such an approach is logically unsatisfactory because it, in effect, applies the § 902(4) "employer" test twice in establishing that the claim falls within the jurisdiction of the LHWCA and the extension of coverage afforded by the 1972 Amendments. In short, the record reveals only that the container was unloaded and that prior to unloading it came from a vessel. We have no idea about why it was unloaded nor about the functional nature of Sea-Land's operations in Building 1220.
 
 
 30
 At oral argument, the petitioner suggested that Suarez's work principally supported Sea-Land's freight forwarding operations in Building 1220; the claimant contended that the container was unloaded for other reasons, such as customs inspection, which seem to be more clearly identifiable as falling on the maritime side of the interface described in Johns, supra. See notes 4, 8 above. The record contains no evidence which would support one or the other of these functional descriptions of operations carried out in Building 1220. In Johns, supra at 639, Judge Gibbons held that the scope of jurisdiction under the LHWCA was to be consistent with the provisions of the Harter Act, 46 U.S.C. § 193, and the Carriage of Goods by Sea Act, 46 U.S.C. § 1303(3), which define the point at which the responsibility of the maritime carrier begins and ends. It is possible under this view that some of Sea-Land's operations in Building 1220 are without the jurisdictional reach of the Harter Act; however, Sea-Land's status as an intermodal carrier makes resolution of this issue impractical without the development of complete factual records. Thus, it is impossible to tell if the interface between land and maritime commerce as described in Johns, supra, takes place within Building 1220, at some earlier point or at some later point.[18]
 
 
 31
 On the state of the record, we must remand for evidence as to whether the stripping of the container was an integral part of the maritime operations or whether the container had reached the land commerce phase of Sea-Land's operations.18a The evidence does show that the loaded container came from a ship, but we do not know when, whether it was stored elsewhere after unloading from the ship and, if so, where. Thus, we are unable to determine whether the container had crossed the interface between land and sea commerce. In this regard, it would be helpful, as we have already indicated, to have evidence of the purpose of stripping the container. What became of the stripped cargo? Was it stored in the warehouse, consolidated with other goods for land or sea shipment, or reloaded on a truck or railroad car? See also factors stated by Judge Friendly at note 18 above.
 
 
 32
 Cappelluti. The conclusion of the administrative law judge that the section 902(3) "status" test was satisfied because the destruction of the damaged container "was the last, but integral and essential step for the efficient conduct of the longshore operation,"[19] is a conclusion unsupported by the record. Also, if the claimant's employment functions for Sea-Land involved only work in the truck maintenance garage and the scrapping of the containers in question, then we hold that these functions are too far removed from maritime commerce to fall within a "proper conception of maritime concerns."[20] This holding would cause us to remand the case with instructions to the Board to dismiss it for lack of jurisdiction but for the fact that the record contains testimony to the effect that Sea-Land's maintenance force, of which the claimant was a member, was frequently required to perform maintenance operations aboard the vessels. Although Sea-Land's witnesses controverted this evidence, the conflict was never resolved because the administrative law judge regarded it as "not pertinent to a determination of Claimant's status."[21] We disagree; non-specialization of the work of employees as well as incidental and sporadic assignment to maritime and non-maritime work as the needs of the moment dictate were important factors in Dravo and may well be of controlling importance in this case.[22] We cannot express any further view of the matter until the functional outlines of Sea-Land's Terminal maintenance operations are fully resolved on the record.[23]III. CONCLUSION
 
 
 33
 In Suarez, No. 76-1033, and in Cappelluti, No. 76-1626, the petitions for review will be granted and the cases remanded to the Board for further proceedings consistent with this opinion, including findings relevant to, and determinations of, the claimants' status as maritime or nonmaritime employees at the time of the injuries. On remand additional testimony may be taken if the present records do not contain sufficient evidence for the purpose of the above remands.
 
 
 
 *
 Honorable Edward N. Cahn, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The Benefits Review Board was created by the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act as part of a new review procedure inaugurated by the Congress in those Amendments. The Benefits Review Board was to replace the district courts as an intermediate step in the review process. See 33 U.S.C. § 921(b), as amended, Act of Oct. 27, 1972, Pub.L. No. 92-576, § 15(a), 86 Stat. 1261, 1262
 As an additional issue in Cappelluti, the petitioners challenge the Director's, Office of Workers' Compensation Programs (DOWCP), participation in the proceedings of this court and before the Board at the initial stage of appellate, administrative and judicial review. In essence, the petitioners argue that to be consistent with the requirements of due process, the DOWCP cannot both process LHWCA claims and appear in the role of an active advocate before the Board and the appellate courts. This issue was recently discussed in detail by the Second Circuit in Pittston Stevedoring Corporation v. Dellaventura, 544 F.2d 35 (2d Cir. 1976), cert. granted, --- U.S. ----, 97 S.Ct. 522, 50 L.Ed.2d 607 (1976); however, the Pittston court did not resolve the question, concluding:
 "Trying to make sense out of these regulations, we think that while the Director, OWCP is a proper party before the ALJ or the BRB, see cases discussed in 3 Larson, Workmen's Compensation Laws § 83.19, at n.49.1 (1976 ed.), the BRB is the proper agency respondent for review in the court of appeals, although the Solicitor of Labor could be designated to represent it. We deem it best to defer resolution of this question to a case where decision on this point is essential, perhaps in the meanwhile the Department will tidy up its regulations."
 Id. at 43, note 5. In the case now before us, the petitioners raise the point for the first time on appeal; nothing in the petitioners' brief suggests that this contention has been presented to the Secretary of Labor, nor do we have the benefit of the Secretary's views with regard to the issue. Under these circumstances, it is clear that our review of the question should be deferred until the agency has had the opportunity to administratively resolve or comment upon the problem. See 5 U.S.C. § 553(e); 3 K. Davis, Administrative Law §§ 20.01 et seq. (1958). Unlike our recent case of Director v. Rochester & Pittsburgh Coal Co. et al., 556 F.2d 565 (3d Cir. 1977), a decision on this issue concerning the participation of DOWCP will not terminate the petition for review. The case of Rochester & Pittsburgh Coal Co. is also distinguishable on a number of other grounds.
 
 
 [2]
 Act of Oct. 27, 1972, Pub.L. No. 92-576, 86 Stat. 1251 (codified in scattered sections of 33 U.S.C. §§ 901-49 (Supp. IV, 1974)), amending Longshoremen's and Harbor Workers' Compensation Act, Ch. 509, §§ 1-48, 44 Stat. 1424 (1927)
 
 
 [3]
 It is evident from the legislative history of the 1972 Amendments that the Congress was concerned about the impact of containerization on the maritime industry and meant some but not all of the employees who were associated with the movement of containerized cargos or containers to be covered. For instance, the Senate Report contains the following language:
 "It is apparent that if the Federal benefit structure embodied in Committee bill is enacted, there would be a substantial disparity in benefits payable to a permanently disabled longshoreman, depending on which side of the water's edge the accident occurred, if State laws are permitted to continue to apply to injuries occurring on land. It is also to be noted that with the advent of modern cargo-handling techniques, such as containerization and the use of LASH-type vessels, more of the longshoreman's work is performed on land than heretofore.
 "The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment. Likewise the Committee has no intention of extending coverage under the Act to individuals who are not employed by a person who is an employer, i. e. a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment. Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters."
 S.Rep. No. 1125, 92d Cong., 2d Sess. (1972) (hereinafter cited as Senate Report) at 13, (emphasis supplied).
 
 
 [4]
 In Johns, supra, Judge Gibbons made the following observations which have an equal relevancy to the cases now before us:
 "Johns was employed at the time of the accident by Sea-Land Service, Inc., an intermodal freight carrier that engages in shipping, stevedoring, warehousing, freight consolidation and motor freight operations. Johns' injury occurred when the flatbed truck he was driving, laden with a large crate, overturned on a public street in Port Elizabeth, New Jersey. Port Elizabeth is a part of the sprawling marine terminal area in Newark and Elizabeth, New Jersey that is operated by the Port of New York and New Jersey Authority. Many longshoremen who are covered by the LHWCA are employed at various locations in the marine terminal area. Many other workers in the terminal area are employed by railroads, and are covered by the Federal Employers' Liability Act. Still others, including teamsters, warehousemen, clerks, secretaries and even bank tellers, who work in the marine terminal area are covered by the New Jersey Workmen's Compensation Act. All, or at least most of these employees, are engaged in facilitating the transfer of cargo at the interface between waterborne modes of transportation and land or airborne modes of transportation. Our problem in this case is to determine on which side of the interface Johns was employed when he was injured. That his employer is an intermodal carrier complicates the problem somewhat, although analytically the fact that a single corporate employer operates several modes of transportation should not influence our judgment respecting the statutory reach of the federal and state workmen's compensation laws."
 Id. at 631-32 (footnotes omitted).
 
 
 [5]
 Collective bargaining agreements with the International Longshoremen's Association, AFL-CIO (ILA) provide that all less-than-container-load and less-than-trailer load containers that are loaded on or unloaded from ships be "stuffed and stripped" by union members at the pier rather than by consolidating companies at their own off-pier facilities and with their own employees who are represented by other labor organizations. Sea-Land is a member of the New York Shipping Association, and is subject to the rules and regulations pursuant to the law of the New York-New Jersey Waterfront Compact, as well as its contract with the ILA. It appears that substantially all of Sea-Land's employees are required to join the ILA. See, e. g., Johns, supra at 639
 In the trade, the act of filling a container with cargo is known as "stuffing," and the act of removing cargo from a container is known as "stripping" or "unstuffing." As an intermodal carrier, Sea-Land, as part of its own operations, apparently performs a service substantially similar to a freight forwarder, consolidator, or distributor when it causes less-than-full containers to be stripped or stuffed at the Terminal in Building 1220.
 We note that recently the Second Circuit held that the ILA's "stuffing and stripping" rules were invalid as an illegal "hot-cargo" contract. See ILA and New York Shipping Association v. NLRB, Twin Express, Inc., et al., 537 F.2d 706 (2d Cir. 1976) (Twin Express), cert. denied, --- U.S. ----, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977). We intimate no view concerning the validity of these rules in this Circuit.
 
 
 [6]
 The building has 167 bays and a dual-track rail spur extending 200 feet inside the building. It is 1,086 feet long and 100 feet wide. Activities conducted there include freight consolidation for less-than-full container loads of inland and seaward bound shipments
 
 
 [7]
 Throughout its brief Sea-Land advances the contention that Building 1220 was a "warehouse" and that Suarez's work function was that of a "warehouseman." This appears to be a labeling approach akin to that rejected by this court in Dravo Corporation v. Maxin, 545 F.2d 374 at page 380 (3d Cir. 1976) (Dravo ). The administrative law judge found that the building was not utilized as a warehouse. Rather, it would appear that some of the less-than-container-load shipments, having been "stripped" from the off-loaded containers, are stored in the building until they can be made up into larger shipments as part of Sea-Land's freight forwarding activities on the landward side of its operations. Compare this discussion with note 3 above
 7a It is not clear from the record whether the ILA's jurisdiction to assign workers such as Suarez to another employer extends so far as to permit assignment to employers who do not fulfill the "employer" test of 33 U.S.C. § 902(4). See note 14 and part II-A below. The claimant's witness, Antanasio, offered an outline of the ILA's "stripping and stuffing" rules which could have provided a partial answer to the problem but for the fact that Antanasio's testimony concerning the procedures used is diametrically different than the description of these activities found in the Second Circuit's opinion in the Twin Express case discussed in note 5 above. Compare appendix at 59a-63a with Twin Express, supra at 708-10. Since this difference may be pertinent to our future review, it should be considered by the trier of fact on remand.
 
 
 [8]
 The claimant holds an ILA card classifying him as a "terminal" or "extra" laborer. This card is required for work assignments covered by the New York-New Jersey Waterfront Compact and ILA collective bargaining agreements. Although Sea-Land contested the probative value of this card and Suarez's ILA classification in determining whether his work function for Sea-Land was covered by the LHWCA, the administrative law judge appears to have relied upon it in making his decision. See appendix at 6a. Such a card has a tenuous relevancy at best as illustrated by the following language of Judge Gibbons in Johns, supra :
 "Johns was a member of the International Longshoremen's Association, but he was not regularly employed by Sea-Land. On the date of the accident Johns had been hired by Sea-Land for the day (a "shape-up" employee) through the Bi-State Waterfront Commission, which operates a longshoring hiring hall. After appearing for work, Johns agreed to work as a shuttle driver, moving with a tractor rig trailers between Sea-Land's old terminal facility at Berth 52, and its new terminal at Berth 90. Both terminal facilities were enclosed by a fence and were under the control of the employer.
 "On the day of the accident, according to the evidence, Johns, at Berth 52, hitched a Sea-Land tractor to a container which had just come off a ship at that berth, and took the container to Berth 90, where Sea-Land stored containers. . . .
 "Our difficulty is that while the evidence respecting Johns' initial trip between Berth 52 and Berth 90 is clear enough, the record is decidedly equivocal about the return trip, during which the accident occurred. Johns testified that he thought the crate was full and was going to a ship, but he gave no information about its source and no other information about its destination. The testimony of William Warnock, the employer's claims adjuster, suggested that Johns may have been mistaken, and may actually have been shuttling equipment between the two terminals, where warehousing and the storage of trailers also takes place. Neither the administrative judge nor the Board made specific findings on this crucial issue. What is clear is that shape-up laborers, hired by the day, are sometimes used to perform what are clearly tasks in maritime employment and are sometimes used in Sea-Land's trucking and warehousing operations. All are members of the longshoremen's union, but obviously that fact is not dispositive of the reach of the federal statute. . . ."
 Id. at 632, 639 (emphasis supplied).
 
 
 [9]
 It is clear that Congress in enacting the jurisdictional sections of the 1972 Amendments, 33 U.S.C. §§ 902(3), (4) and 903(a), used broad and somewhat general language. However, it is equally clear that the Congressional intent was that those charged with administering the LHWCA should develop the expertise to give more definite shape and content to those sections keeping always in mind the Act's fundamental purpose, the improvement of maritime safety and working conditions. See, e. g., Senate Report at 2, 4, 9, 12. Congress intended that the Board investigate as well as adjudicate and adequate power was given to it in the 1972 Amendments to carry out this function. See 33 U.S.C. §§ 921, 923, 927, as amended, Act of Oct. 27, 1972, Pub.L. 92-576, §§ 15(a), 15(e), 86 Stat. 1261, 1262. See also Pittston Stevedoring Corp. v. Dellaventura, supra at 47
 Undeveloped factual records merely protract the litigation and the subsequent litigation expenses reduce the availability of funds to improve safety conditions for those who were the principal concern of Congress and who come most clearly under the Act's coverage, the true longshoremen who actually work on the ships and the docks.
 
 
 [10]
 As noted above, Congress created the Board to replace the district courts as an intermediate stage in the appellate process. See 33 U.S.C. § 921(b) as amended. Section 921(b)(3) defines the authority of the Board with the following language:
 "The Board shall be authorized to hear and determine appeals raising a substantial question of law or fact taken by any party in interest from decisions with respect to claims of employees under this chapter and the extensions thereof. The Board's orders shall be based upon the hearing record. The findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole. . . ."
 Our jurisdiction is based upon 33 U.S.C. § 921(c) as amended Oct. 27, 1972, Pub.L. 92-576, § 15(a), 86 Stat. 1261, 1262. Our review is governed by the "substantial evidence" test of section 921(b)(3). See e. g., Senate Report at 15.
 
 
 [11]
 The parties disputed the distance of the accident's situs from the Elizabeth Channel. The administrative law judge found it to be about 800 feet. Under Judge Gibbons' analysis in Johns, supra, the distance is not of controlling importance on these facts
 
 
 [12]
 The cutting-up of damaged containers was done next to a cyclone fence at the extreme southeast corner of the marshalling yard where such containers were left prior to their destruction. (A.L.J.X. 2 at 317a) The administrative law judge found that the claimant had been scrapping containers for "three or four days prior to the accident."
 
 
 [13]
 Section 902(3) provides as follows:
 "The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."
 
 
 [14]
 Section 902(4) provides as follows:
 "The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)."
 
 
 [15]
 Section 903(a) provides as follows:
 "Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). . . ."
 
 
 [16]
 Many of the arguments raised by the parties in both cases have been resolved by decisions of this court in Dravo Corporation v. Maxin, 545 F.2d 374 (3d Cir. 1976) and Johns, supra, which were decided after the briefs in these appeals were filed. In the briefs and at oral argument in these cases, the Board's attorneys have urged that 33 U.S.C. § 920(a) creates a "statutory presumption" that the claim comes within the provision of the Act. We discussed this contention in Dravo, supra, note 7 at 380, and observed that the issue has been decided with mixed results by several courts of appeals. The principal question in each of the present cases is whether the work function of the employee for Sea-Land can be said to fall within the functional meaning of the term "longshoring" as Congress employed that term in extending the coverage of the LHWCA by enacting the 1972 Amendments. This would appear to be essentially a legal question and not a factual one. But we expressly do not decide the point at this time since it is evident that resolution of the problem requires an adequate factual development in the record. Accordingly, in both cases our decision is predicated upon application of the "substantial evidence" test as described in 33 U.S.C. § 921(b), (c) as amended Oct. 27, 1972, Pub.L. 92-576, § 15(a), (b), 86 Stat. 1261, 1262, and in the Senate Report at 15
 
 
 [17]
 A substantially identical conclusion by the Board was rejected as insufficient by Judge Gibbons in Johns, supra at 639-40
 
 
 [18]
 Judge Friendly offered the following observations in Pittston, supra, which are equally applicable to these cases:
 "We begin our analysis by remarking on the unsatisfactory state of the records before us, even if we include for this purpose the two petitions which we have dismissed. When cases of this nature began coming to the BRB shortly after the enactment of the Amendments, it should have realized that it was faced with a major task of statutory construction in determining what constitutes 'maritime employment' or being a 'longshoreman or other person engaged in longshoring operations' which task could be performed satisfactorily only in the light of an extensive factual background detailing the structure of work on the various piers of this country. The following are illustrative of facts we would like to know but on which these records shed little or no light, even as regards the port of New York, let alone the rest of the nation. Does one gang normally take cargo off or on the ship while another is responsible for transportation beyond the 'point of rest'? Does the same gang always, sometimes, or often perform both jobs? Is all work on the pier normally conducted by a single employer or is there a division between the stevedore and the 'terminal operator'? Even if there is only one employer, does he segregate the employees in their work assignments, by having different collective bargaining agreements or otherwise? Are separate charges made for services beyond the 'point of rest' and, if so, for what? Does the 'point of rest' shift about on the same pier? Just what is the normal practice for stripping and stuffing containers with goods belonging to different owners or destined to different consignees? Is this work normally done on the pier or in warehouses not adjoining navigable waters? What determines the choices? Does the hazardous nature of the employment stop at the point of rest or continue so long as the cargo is on the pier? Do the hazards change in frequency or degree as the longshoreman moves away from the water? The consolidation of several cases presenting different factual situations in a single large proceeding might have enabled the BRB to make meaningful distinctions. Instead of developing such a record and laying down guidelines for the ALJ's, the BRB has handled each case on an individual basis, and without establishing any record support for the interpretive rules announced therein."
 Id. at 47 (footnote omitted). See also note 23 below.
 18a We recognize that two Circuits have upheld the Board's determination that "stripping" containers unloaded from a vessel was a longshoring operation, and, therefore, that employees injured while performing such an activity were within the extended coverage of the LHWCA. See Stockman v. John T. Clark & Son of Boston, Inc., 539 F.2d 264 (1st Cir. 1976), petition for cert. filed, 45 U.S.L.W. 3332 (No. 76-570, Nov. 2, 1976); Pittston, supra at 53-54. Under principles of federal comity and the emphasis on uniformity in maritime law, normally we would follow the lead of those courts which have already decided the question especially that of the Second Circuit since this court shares appellate review with the Second Circuit over the geographical area comprising one of the country's major east coast harbor complexes, the port of New York-Northern New Jersey. However, both cases are factually distinguishable from the one presently before us. For instance, it is evident in the Pittston decision that the injuries of the claimants Blundo and Caputo occurred on the pier and that the claimants had frequent occasion to actually perform a substantial part of their duties aboard the vessel. See Id. at 53-56. In Stockman, supra, the parties stipulated that the claimant was a "longshoreman" who worked on the docks. Id. at 266.
 In addition, while explicitly alluding to the precise issue before us in this case, whether "stripping" could be considered a longshoring activity when carried out in a place such as Building 1220, neither the Pittston court nor the Stockman court chose to decide the question. Instead, both courts chose to rely upon the facts outlined above, which distinguish both decisions from this case. See Pittston, supra at 56, and Stockman, supra at 272, 276-77. Thus, ultimately the holdings of those cases are fairly narrow. Finally, we note that Pittston and Stockman were decided considerably before this court's decision in Johns, supra, a decision not available to the Board at the time of their review in this case. While it is evident that Judge Gibbons relied upon Pittston to some extent in writing the Johns opinion, it is also clear that the focus of Judge Gibbons' legal analysis in Johns (and subsequently Dravo ) is substantially different from that emphasized in Pittston and Stockman, although in many cases the results would apparently be the same. It is evident that to obtain truly meaningful results following the rationale of Johns and Dravo, we depend first upon an adequate record.
 For the reasons stated, we need not expand the holdings in Pittston and Stockman at this time.
 No other Circuit appears to have decided a case with circumstances similar to those in Cappelluti; Jacksonville Shipyards, Inc. v. Perdue, 539 F.2d 533 (5th Cir. 1976), is not on point.
 
 
 [19]
 This analysis requires the conclusion that scrapping the containers would have been an integral step in the conduct of Sea-Land's trucking operations had the containers in question been damaged on the highway. Thus, if Cappelluti's job had taken him from a container damaged at sea to one damaged on the road, under the Board's analysis, he would have moved in and out of the Act's coverage from moment to moment in doing identical work at the same situs. This result is clearly against the Congressional will expressed in the legislative history of the 1972 Amendments. See, e. g., Dravo, supra at 377-378; Johns, supra at 636-37; Senate Report at 12-13. There is nothing in the record to suggest that work on sea-damaged containers is inherently more dangerous or qualitatively different than work on road-damaged containers
 
 
 [20]
 The ILA as amicus curiae has filed an extensive brief in this case urging that we find that the claimant was covered by the LHWCA. Point I of the brief attacks the "point of rest" theory adopted by the Fourth Circuit to determine the extent of the 1972 Amendment's geographical coverage. We rejected this theory in Johns, supra at 638-39, an opinion not available to the ILA at the time their brief was written in this case. Point II relies on the claimant's membership in an ILA local. In Johns, supra at 639-40 and in this opinion at note 8 supra, we found that this is not a controlling factor. Point III relies upon rules, regulations and definitions promulgated pursuant to the New York-New Jersey Waterfront Compact. This last argument was rejected as "not particularly helpful" by Judge Friendly in Pittston, supra at 50. We concur in that conclusion
 
 
 [21]
 The administrative law judge concluded as follows:
 "(I)t is the nature of work being performed and the actual duties at the time of the injury which are determinative.
 "The same rationale is applicable to the extensive testimony adduced by both Claimant and Respondents concerning the general and collateral duties of Employer's maintenance mechanics, other Maintenance Department personnel, or operations in connection with the truck garage. Similarly, the fact that Claimant has not worked aboard a vessel, or that other maintenance personnel have on occasion worked aboard ship, or assisted in moving containers, is not pertinent to a determination of Claimant's status. For, if situs requirements are met, and the injury occurs in connection with maritime employment, it is compensable, notwithstanding the employee's habitual performance of other and different duties. The inquiry herein, therefore, is whether or not Claimant's actual work activity, at time of injury, constituted maritime employment within the intent of the Act."
 Appendix at 20a-21a (footnotes omitted).
 
 
 [22]
 Cf., Dravo, supra at 381; Stockman, supra at 276-77
 
 
 [23]
 As we have noted above, the record in both cases contains controverted facts and inferences that were not resolved in the proceedings below. In addition, in the briefs and at oral argument the parties presented significantly different descriptions of the operational interrelationships and flow of commerce at Sea-Land's Port Elizabeth facility. No point of view concerning these descriptions was adopted by the trier of fact at No. 76-1626. In Pittston, at 47, Judge Friendly proposed a series of questions which may prove helpful in resolving the central query. See note 18 above. However, one additional pragmatic point is relevant and may be of controlling importance in cases where the claimant's employment function arguably falls in either the landward or seaward phase of the employer's operations. This is the effect that extending coverage to the claimant and others similarly situated may have on the employer's safety programs. The clearest purpose of Congress in enacting the 1972 Amendments was to provide a practical incentive to increase safety in high-risk maritime occupations. For instance, the Senate Report contains the following wording:
 "SAFETY
 "It is important to note that adequate workmen's compensation benefits are not only essential to meeting the needs of the injured employee and his family, but, by assuring that the employer bears the cost of unsafe conditions, serve to strengthen the employer's incentive to provide the fullest measure of on-the-job safety.
 "This consideration is particularly crucial with respect to high-risk occupations such as those covered by this Act. Longshoring, for example, has an injury frequency rate which is well over four times the average for manufacturing operations. It is the Committee's view that every appropriate means be applied toward improving the tragic and intolerable conditions which take such a heavy toll upon workers' lives and bodies in this industry, and such means clearly include vigorous enforcement of the Maritime Safety Amendments of 1958 and the Occupational Safety and Health Act of 1970, as well as a workmen's compensation system which maximizes industry's motivation to bring about such an improvement."
 Senate Report at 2. It is obvious that extending the Act's coverage too widely must, of necessity, reduce the amount of funds available to improve the safety conditions for those most clearly coming within the Act the pierside and shipboard longshoremen.